Hillsborough-northern judicial district
No. 95-011

THE STATE OF NEW HAMPSHIRE

v.

DENISE LESNICK

June 6, 1996

*Jeffrey R. Howard*, attorney general (*Janice K. Rundles*, senior assistant attorney general, on the brief and orally), for the State.

*Richard N. Ivker*, of Boston, Massachusetts, and *Paul A. Maggiotto*, of Concord (*Mr. Ivker* and *Mr. Maggiotto* on the brief, and *Mr. Ivker* orally), for the defendant.

BRODERICK, J. The defendant, Denise Lesnick, was convicted of second degree murder. *See* RSA 630:1-b (1986). On appeal, she argues that the Superior Court (*Sullivan*, J.) erred in admitting evidence of prior bad acts under New Hampshire Rule of Evidence 404(b) and in failing to restrict certain cross-examination of a defense witness. We affirm.

I

In the early morning of September 9, 1993, Manchester Police Officers David Connare and William Jones went to the Colonial Village Apartments to investigate a domestic disturbance. There they discovered Paul Lesnick lying on the floor, bleeding from a stab wound to his chest. The apartment was in disarray and the lights were out. Connare asked the defendant what had happened, and she replied that she "didn't know it was him." Emergency medical technicians soon arrived, and Officer Connare took the defendant aside to question her in more detail; as he did so, the victim said, "Don't arrest my wife. She didn't mean to do it."

The defendant waived her *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and told Connare that after she and the victim, her husband, had argued, he had gone to his mother's house and she had returned to the apartment. She said she had "lost her mind," cutting up furniture and the victim's clothing, and destroying his stereo equipment. The defendant explained that she was destroying the property because she did not want her husband to "take anything out of the relationship."

The defendant stated that she next began to pack some of her belongings in her car and was resting for a moment when she heard a noise. She located a knife and went to investigate. Seeing a "shadow" that "reached out and grabbed her shoulder," she turned and stabbed at it, thinking the "shadow" was one of two men who had earlier been heckling her as she was moving her things to her car.

While Connare was questioning the defendant, the victim stated to another police officer that he did not want his wife arrested because "it was an accident." Later, in the ambulance, he stated: "I know I am not going to make it," and "my wife didn't do this on purpose." He died shortly after arriving at the hospital.

The defendant was indicted for second degree murder. *See* RSA 630:1-b. The indictment charged that the defendant caused her husband's death "recklessly . . . under circumstances manifesting an extreme indifference to the value of human life, by stabbing him in the chest with a knife." Prior to trial, the defendant filed a notice of intent to claim self-defense. She intended to admit that she stabbed her husband believing he was an unknown intruder. Following trial, the jury found the defendant guilty, and she was subsequently sentenced to twenty years to life in the New Hampshire State Prison. This appeal followed.

## II

The defendant first argues that the trial court erred in admitting evidence that she had used a knife against her husband in July 1993, two months prior to his death. The State sought to introduce this evidence to counter the defendant's assertion that she mistook her husband for an intruder. Before trial, the court heard testimony on the incident.

Pauline Deselits, a neighbor at the Colonial Village Apartments, testified that she saw the defendant smashing the windows of a grey two-door car with a clothes iron. She did not see the victim, but she heard him yell, "Hey, that's my brother's car." After the defendant drove away in another car, Ms. Deselits phoned the police. Her call was received at 12:57 p.m.

Manchester Police Officer John D. Murphy arrived at the scene at 1:02 p.m. The victim was upset. According to Officer Murphy, the victim stated that he and the defendant had argued and she had left the apartment. She returned at about 12:55 p.m. and a confrontation ensued, during which the defendant stuck a knife in the bathroom door twice; threw a candlestick holder at the victim, cutting his ear; stabbed him in the back of the neck; and threw the knife at him. The victim told the officer that the defendant had then smashed his car's windshield with a clothes iron.

Officer Murphy testified that he observed a fresh two-inch surface cut on the back of the victim's neck, a cut on one of his ears, a quarter-inch cut below his right eye, and the shattered windshield. The officer radioed the defendant's name and a description of her car to his dispatcher, and he informed the victim that the defendant

would be arrested if she was stopped in the next six hours. In response, the victim stated that his wife just wanted to scare him, and that his injuries had been an accident. He refused medical treatment and told Officer Murphy that he did not want a restraining order against his wife.

The trial court ruled the evidence of the July 1993 incident admissible under Rule 404(b). The rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Other bad acts evidence "is only admissible if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." *State v. Kirsch,* 139 N.H. 647, 653, 662 A.2d 937, 942 (1995). We will not disturb a decision to admit this evidence absent an abuse of discretion. *Id.* The defendant challenges the admissibility of evidence of the July 1993 incident on each prong of the Rule 404(b) analysis.

### A

The defendant asserts that the July 1993 incident was irrelevant to the crime charged because it demonstrated only her bad character and violent disposition. "The State bears the burden in criminal matters of demonstrating the relevance of other bad acts." *State v. Melcher,* 140 N.H. 823, 828, 678 A.2d 146, 149 (1996). To be relevant, the other bad act evidence must "tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity." *Id.* (quotation omitted).

The State argued below, as it does before us, that evidence of the July 1993 incident was relevant to refute the defendant's claim of accident. The foundational premise for admitting other bad acts on the grounds of absence of mistake or accident is a defendant's claim of mistake or accident as a defense. *See State v. Whittaker,* 138 N.H. 524, 527, 642 A.2d 936, 938 (1994). In addition, there must exist some clear and logical connection between the other acts and the conduct the defendant maintains was mistaken or accidental. *See United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987). At a minimum the other acts and the crime for which the defendant was charged must be similar in kind. *See id.* at 662–63.

■ These requirements were met here. The defendant filed timely notice that she intended to utilize a justification defense at trial. *See* SUPER. CT. R. 101 (requiring notice of intent to claim defenses set forth in Criminal Code); RSA 627:4, II(d) (1986) (justifying use of deadly force in self-defense). In view of her assertion that she would not have attacked the victim had she known who he was, the defendant's self-defense claim necessarily raised the issue that she committed the stabbing without the requisite culpable mental state — in other words, mistakenly or accidentally.

■ Further, the July 1993 incident and the crime charged were clearly and logically connected. Separated by only two months, the incidents involved the same victim and a similar weapon, and each occurred in like circumstances — following a confrontation between the defendant and her husband. Evidence of the July 1993 incident would thus tend to negate a defense of mistake or accident by showing that "the defendant had strong feelings toward a particular individual that may have contributed to the formation of intent." *Hogue*, 827 F.2d at 664; *see also People v. Illgen*, 583 N.E.2d 515, 520 (Ill. 1991).

The defendant suggests the trial court's ruling is undermined by the court's failure to articulate how this evidence was relevant apart from its tendency to show propensity. In *State v. McGlew*, 139 N.H. 505, 658 A.2d 1191 (1995), we announced the requirement that the trial court "explain precisely how the evidence relates to the disputed issue, without invoking propensity." *Id.* at 510, 658 A.2d at 1195. The court in this case, however, did not have the benefit of our decision in *McGlew*. In addition, the court provided a detailed order explaining the basis of its ruling with regard to the relevance of the July 1993 incident. There was no error.

## B

■ The defendant next argues that there was no clear proof of the July 1993 incident under the second prong of our Rule 404(b) analysis. The "clear proof" requirement is satisfied when the State presents evidence "firmly establishing that the defendant, and not some other person, committed the prior bad act." *State v. Michaud*, 135 N.H. 723, 727, 610 A.2d 354, 356 (1992). Whether there was clear proof of the July 1993 incident for purposes of Rule 404(b) is a preliminary determination concerning the admissibility of evidence, and the trial court is not bound by the rules of evidence in making this determination. *See* N.H. R. EV. 104(a).

■ To establish clear proof of the July 1993 incident, the State offered the victim's statements to Officer Murphy. These statements

were made within minutes of the incident, and no evidence was presented that he had a motive to fabricate. Moreover, the statements were corroborated by the testimony of Officer Murphy, who observed that the victim's injuries were consistent with his account of what had transpired, and of Ms. Deselits, who heard the victim yelling and saw the defendant smash the car windows and drive from the scene. The testimony of the witnesses together with the victim's statements constitutes clear proof in this case that the defendant had committed the prior bad acts in July 1993. *See State v. Trainor*, 130 N.H. 371, 374–75, 540 A.2d 1236, 1238 (1988).

## C

The defendant also asserts that the trial court improperly balanced prejudice and probative value under the third prong of the Rule 404(b) analysis. Evidence is admissible under this prong "if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." *Kirsch*, 139 N.H. at 653, 662 A.2d at 942. To prevail on her argument that the probative value of the evidence of the July 1993 incident was substantially outweighed by its prejudicial impact, the defendant must show that the trial court's determination was "clearly untenable or unreasonable to the prejudice of h[er] case." *State v. Marti*, 140 N.H. 692, 694, 672 A.2d 709, 711 (1996) (quotation omitted).

The proper balancing of prejudice and probative value cannot be reduced to formulae. Among the factors a trial court must consider in weighing prejudice is the nature of the other bad act, as "[s]ome acts have a great emotional impact upon a jury and have greater potential for appealing to a juror's sense of resentment or outrage." *McGlew*, 139 N.H. at 510, 658 A.2d at 1196. Also, the evidence's probative worth must be considered in the context of its "incremental" value; in other words, the trial court should consider the extent to which the issue on which the evidence is proffered "is established by other evidence, stipulation, or inference." *Id.* at 510–11, 658 A.2d at 1196 (quotation omitted).

In this case, the evidence of the argument between the defendant and the victim on July 8, 1993, and of the defendant's assault on the victim on that date, was not inflammatory. These were not acts likely to cause the jury "to base its decision on something other than the established propositions in the case." *Id.* at 510, 658 A.2d at 1195 (quotation omitted). At the same time, the probative value of the evidence was high: given that the State had to prove beyond a reasonable doubt that the victim's death was not, as the defendant claimed, accidental, and that the defendant was the only

surviving witness, evidence of the July 1993 incident was uniquely probative on the issue of intent. We cannot say that the trial court abused its discretion in so concluding.

### D

Before turning to the defendant's remaining arguments, we briefly address her other exceptions to the admission of the July 1993 incident. First, the defendant suggests the trial court erred in ruling that the victim's statements to Officer Murphy were admissible hearsay. Whether statements are admissible under an exception to the hearsay rule is a determination for the trial court in the first instance, and we will not disturb the court's ruling in this regard unless it is clearly erroneous. *Worster v. Watkins*, 140 N.H. 546, 548, 669 A.2d 212, 215 (1995).

The court below ruled the victim's statements to Officer Murphy admissible under the hearsay exception for "excited utterances." This exception permits the admission of hearsay statements "relating to a startling event or condition made while under the stress of excitement caused by the event or condition." N.H. R. Ev. 803(2). To qualify, the utterance must be "a spontaneous verbal reaction to some startling or shocking event, made at a time when the speaker was still in a state of nervous excitement produced by that event, and before he had time to contrive or misrepresent." *State v. Woods*, 130 N.H. 721, 726, 546 A.2d 1073, 1076 (1988) (quotation omitted).

In this instance, the victim's statements were excited utterances. The events of July 8, 1993, were inarguably startling: the defendant's smashing car windows and the victim's yelling created a disturbance sufficient to warrant a call to the police. Officer Murphy arrived within minutes of this call to discover the victim still upset, and the victim made the statements at issue immediately after the officer's arrival. That these statements were spontaneous is further evidenced by the victim's recanting when the officer suggested the defendant could be arrested. In these circumstances, the fact that the declarant may have been responding to a police officer's inquiries does not compromise the trial court's conclusion that the statements were spontaneous and, therefore, admissible. *See State v. Coppola*, 130 N.H. 148, 154, 536 A.2d 1236, 1240 (1987), *remanded for new trial on other grounds sub nom. Coppola v. Powell*, 878 F.2d 1562 (1st Cir.), *cert. denied*, 493 U.S. 969 (1989).

The defendant also contends the trial court erred in allowing the State to use the July 1993 incident to counter the victim's statements that the defendant "didn't mean to do it" and "didn't do

this on purpose." The parties do not dispute that these "dying declarations" were admissible. *See* N.H. R. EV. 804(b)(2). A review of the record reveals that the trial court instructed the jury that it could use "the evidence of the [July 1993] incident to assist . . . in interpreting [the victim's] statements on the night that he was killed and in determining the weight to be given his statements." Based upon the record before us, the defendant did not object to this instruction. The evidence was admissible in any event to rebut the defendant's claim of accident, as discussed above, and to challenge the veracity of the victim's dying declarations.

### III

The defendant next argues that the trial court erred in admitting evidence that she had threatened to kill the victim on two prior occasions. The first was in the fall of 1991, when the defendant and the victim were separated. Gary Gilman, the victim's stepfather, testified that the defendant had called the Gilman home several times within a few minutes looking for her husband. When Mr. Gilman told her to stop calling, the defendant responded, "Well, when you see him, tell him I'm going to kill him."

The second occasion was in July 1992. Lisa Dudley, who was married to the defendant's cousin and had been a close friend of the defendant, testified that she had visited the defendant while the defendant was separated from the victim and pregnant with their second child. The defendant was upset because her husband had left her; according to Mrs. Dudley, the defendant "said the only way to stop [the victim] from doing what he does to other women was to kill him."

The trial court ruled that under Rule 404(b), the defendant's threatening statements were probative of the defendant's intent and not so prejudicial as to make them inadmissible. The defendant now contends that the statements lacked relevance and were substantially more prejudicial than probative. The State, for its part, maintains that the defendant's statements were properly introduced as admissions and, therefore, they need not be analyzed under Rule 404(b).

We agree with the State that the defendant's threatening statements fall within the general rule that "[a] defendant's extrajudicial statement giving rise to a reasonable inference of guilt constitutes an admission." *State v. Martineau*, 116 N.H. 797, 799, 368 A.2d 592, 594 (1976). Though introduced for their truth, these out-of-court statements were not hearsay under our rules of evidence. *See* N.H. R. EV. 801(d)(2)(A). Further, in the circum-

stances of this case, the statements were not evidence of a prior wrongful act within the meaning of Rule 404(b). *See United States v. West*, 898 F.2d 1493, 1499 (11th Cir. 1990). This evidence thus was subject only to the requirements of Rule 403.

Under Rule 403, evidence of the defendant's threatening statements was admissible so long as its probative value was not substantially outweighed by prejudice to the defendant. As part of its Rule 404(b) analysis, the trial court necessarily found the threatening statements probative of the defendant's intent and not substantially outweighed by prejudice to the defendant. *See Marti*, 140 N.H. at 694, 672 A.2d at 711 (balancing tests under Rules 403 and 404(b) are identical). Because the defendant has not demonstrated that this finding was untenable or unreasonable to the prejudice of her case, we conclude that the trial court did not abuse its discretion in admitting the defendant's threatening statements.

## IV

The defendant's final argument concerns the trial court's permitting the State to cross-examine the defendant's mother about the defendant's violent conduct. The defendant's mother, Charmaine Martel, testified on direct examination about the violent character of her daughter Marlene, the defendant's sister. She stated that she had special knowledge of Marlene and the defendant and compared the sisters' respective dispositions, concluding that Marlene — not the defendant — was prone to violence. For purposes of impeachment, the State on cross-examination asked Mrs. Martel whether she was aware of three specific incidents of the defendant's violent behavior.

The defendant now contends that the trial court abused its discretion in allowing this cross-examination because the witness had not "opened the door," and because the evidence was unfairly prejudicial. "[T]he defendant, by presenting certain evidence, may 'open the door' to the introduction of otherwise inadmissible evidence for the limited purpose of impugning the veracity of the witness presented by the defendant." *State v. Mello*, 137 N.H. 597, 601, 631 A.2d 146, 148 (1993) (quotation omitted). The trial court is in the best position to determine whether the "door" has been "opened," and we will not disturb its determination absent an abuse of discretion. *See State v. Taylor*, 139 N.H. 96, 100, 649 A.2d 375, 377 (1994).

In this case, the record reveals that Mrs. Martel did not simply deny being able to recall the defendant having acted

violently; rather, she testified ultimately that she did not believe the defendant was "physically violent." In view of this testimony, the court properly concluded that the "door" had been "opened." *See Mello*, 137 N.H. at 601, 631 A.2d at 148. Once Mrs. Martel "opened the door," the State was "entitled to counter with evidence to refute the impressions created by [her] testimony." *Id.* (quotation and ellipses omitted). Further, the impeachment evidence in this instance was limited to three discrete incidents of the defendant's prior conduct, and the defendant did not request a limiting instruction. We cannot say that the trial court erred by permitting the prosecution to inquire about these incidents.

*Affirmed.*

All concurred.