Sullivan
No. 2002-197

## MICHELLE MADEJA

### v.

## MPB CORPORATION d/b/a SPLIT BALLBEARING

Argued: February 6, 2003
Opinion Issued: April 23, 2003

*Upton & Hatfield, LLP*, of Concord (*Robert Upton, II* and *Heather M. Burns* on the brief, and *Mr. Upton* orally), for the plaintiff.

*Craig L. Staples*, of Concord, by brief and orally, for the defendant.

BROCK, C.J. The defendant, MPB Corporation d/b/a Split Ballbearing, appeals a jury verdict in Superior Court (*Morrill*, J.) awarding the plaintiff, Michelle Madeja, compensatory and punitive damages for the sexual harassment and retaliation claims she brought under Title VII of

the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e (2000) (Title VII), and RSA chapter 354-A.

On appeal, the defendant argues that the trial court erroneously: (1) instructed the jury regarding employer liability for co-worker sexual harassment; (2) instructed the jury regarding employer liability for co-worker retaliation; (3) denied the defendant's motion for judgment notwithstanding the verdict with respect to the plaintiff's sexual harassment, retaliation and punitive damages claims; (4) submitted a special verdict form that did not include the defendant's affirmative defenses; (5) admitted evidence regarding Sprague's subsequent termination for sexual harassment; and (6) declined to admit evidence that the plaintiff's immediate prior employer received complaints about her poor attitude. Additionally, the defendant argues that this court should set aside or reduce the punitive damages award because it violates the defendant's federal due process rights. *See* U.S. CONST. amend. XIV. We note, at the outset, that the defendant does not challenge whether the evidence that the conduct constituted sexual harassment was sufficient. We affirm.

The jury could have found the following facts. The defendant manufactures ball bearings. On July 27, 1998, it hired the plaintiff to be a full-time pre-assembly inspector of ball bearings. On August 3, one of the plaintiff's co-workers complained to Rose Henry, the senior shift supervisor, that the plaintiff verbally harassed and pulled the hair of another employee. Henry advised the plaintiff that the company would not tolerate this kind of behavior and that it might discipline her if she engaged in it again.

On August 29, another co-worker complained to a different supervisor, Larry Sprague, that the plaintiff "was being rude [and] making sarcastic remarks to her." Sprague told the plaintiff to stop this behavior.

On Friday, September 11, Ernie Danyew, the plaintiff's trainer, told Sprague that he could not work with the plaintiff because of her "smart ass attitude toward everyone in the room." After consulting with the factory manager, Michael Santaniello, Sprague told the plaintiff that she had one week to demonstrate "a very distinct change in her attitude" and that if she failed to do so, the company "would not put any more effort into her."

The following Monday, September 14, the plaintiff told Sprague that she believed she knew why Danyew complained about her. She said that "a long time ago," Danyew had asked for her address, which she gave him, and had asked if he could stop by sometime with a six-pack of beer. Because she thought he was kidding, she said, "sure." A few days later, she learned that he had come by her apartment when she was not home.

Earlier in the week beginning September 4, 1998, Danyew told her that he still had the six-pack of beer and asked if he could come by after she brought her son to school. When she said she was busy, Danyew asked if he could come by over the weekend. When she again said that she would be busy, Danyew protested that it would only be for a few minutes. The plaintiff said "no."

The plaintiff also told Sprague that, in the past, every time Danyew walked by her, he rubbed her shoulders. Although Danyew had stopped doing this, on Friday, September 11, at break time, he sat a few inches from her on a picnic bench. She got up and left the bench because the "whole thing made her feel creepy." She asked Sprague not to do anything to Danyew because she believed he now understood that she was not interested in him. Sprague told the plaintiff that he would document their conversation and that if it happened again, she should come to him right away. Sprague then documented the conversation and the plaintiff signed his recitation of it.

Sprague reported the plaintiff's complaint to his direct supervisor, Bruce Richardson, the area manager, who in turn, reported it to his supervisor, Santaniello. Richardson and Santaniello discussed the plaintiff's complaint with Richard Ackerman, the human resources manager.

On September 15, the following day, Sprague met with Danyew to discuss the plaintiff's complaint. Danyew admitted that he had asked the plaintiff if he could stop by her home with a six-pack of beer and that he had done so once when she was not home. He said he had intended this to be a "friendly gesture." Sprague told Danyew that it did not matter that he intended his gesture to be "friendly." Sprague informed Danyew that he would no longer be scheduled to work with the plaintiff and that he should stay away from her. He also warned Danyew not to discuss the matter with her.

Two or three days later, Sprague asked the plaintiff if Danyew was still bothering her. She said, "no." After lodging her complaint on September 14, 1998, the plaintiff and Danyew did not work together again. Danyew, however, was angry with the plaintiff for bringing what he believed was an unfounded complaint of sexual harassment.

On September 21, Sprague received a complaint about the plaintiff from another trainer, Susan Thibodeau. Thibodeau said that she did not "feel comfortable" working with the plaintiff. When asked why, Thibodeau explained that the plaintiff did not care if she made mistakes and, when confronted, she became defensive. Thibodeau also stated that when she and the plaintiff worked together on Saturday, September 19, the plaintiff

was unproductive, inspecting twenty-four bearings per hour as compared to Thibodeau's 120 bearings per hour.

Thibodeau was a friend of Danyew's to whom he had spoken about the plaintiff. Danyew told Thibodeau that the plaintiff had complained that he sexually harassed her, to which Thibodeau had responded that "[i]t sounds just like her." Danyew, Thibodeau and the other trainers discussed the need for the company to fire the plaintiff. As Danyew testified, "[T]his was discussed before and after, you know, that this kid, something has to be done. The company didn't get rid of her, so, you know ... we decided to be cold to her, you know, treat her like not part of the group." Danyew and the other trainers, including Thibodeau, said amongst themselves, "If the company is not going to get rid of her, enough of our complaints will."

After receiving Thibodeau's complaint, Sprague asked her to keep the bearings she inspected separate from those the plaintiff inspected that night. Sprague observed that the plaintiff was unproductive.

Sprague spoke with the senior shift supervisor, Henry, about the plaintiff's low productivity. Henry, who knew of neither the plaintiff's complaint against Danyew nor Danyew's complaint about the plaintiff, recommended that Sprague terminate her. Sprague recommended termination to his supervisor, Richardson, who agreed. Richardson forwarded Sprague's recommendation to Santaniello, who also agreed with it. Santaniello discussed the recommendation with Ackerman, who made the final decision to terminate the plaintiff. The defendant terminated the plaintiff's employment on September 22, 1998.

The plaintiff sued the defendant for sexual harassment and retaliation under RSA chapter 354-A and Title VII. The jury found in her favor. In addition to other damages, it awarded her $350,000 in punitive damages for her Title VII claims. The court later reduced the punitive damages award to $300,000 to comply with the cap on such awards under the Civil Rights Act of 1991. *See* 42 U.S.C. § 1981a (b)(3)(D) (2000).

*I. Jury Instructions*

The defendant argues that the court erroneously instructed the jury regarding employer liability for co-worker sexual harassment and retaliation.

"The purpose of jury instructions is to identify issues of material fact, and to inform the jury of the appropriate standards of law by which it is to resolve them." *Broderick v. Watts*, 136 N.H. 153, 163 (1992). We review jury instructions in context and will not reverse unless the charge, taken in its entirety, fails to explain the law applicable to the case adequately so as to mislead the jury. *See Simpson v. Wal-Mart Stores*, 144 N.H. 571, 574 (1999).

## A. Sexual Harassment

The trial court instructed the jury about employer liability for co-worker sexual harassment under both RSA chapter 354-A and Title VII as follows:

An employer is liable for sexual harassment committed by a co-worker of the plaintiff only if the employer:

... Knew or should have known of the harassment; and,

... Failed to take prompt, effective remedial action reasonably calculated to end the harassment.

The court explained that to avoid liability for co-worker sexual harassment:

The defendant's remedial action must be reasonable and adequate. Whether the defendant's remedial action is reasonable and adequate depends upon the remedy's ability to stop the individual harasser from continuing to engage in such conduct and to discourage other potential harassers from engaging in similar unlawful conduct. An effective remedy should be assessed proportionately to the seriousness of the offense.

The defendant argues that these instructions were improper because they allowed the jury to find the defendant liable for a merely negligent response to the alleged sexual harassment. The defendant asserts that mere negligence is insufficient. *See Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998). As the court in *Blankenship* explained:

[B]ecause harassment is an especially invidious form of discrimination, as to which employers should be particularly vigilant, negligence as to the existence of harassment can be serious enough to constitute an intentional act of discrimination.

Once an employer is aware of and responds to charges of sexual harassment, though, mere negligence as to the content of the response cannot be enough to make the employer liable. ... When an employer implements a remedy, it can be liable for sex discrimination ... only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

*Id.*

As this is an issue of first impression under RSA chapter 354-A, we rely upon cases developed under Title VII to aid in our analysis. *See N.H. Dep't of Corrections v. Butland,* 147 N.H. 676, 680 (2002).

We believe that the defendant mistakenly relies upon *Blankenship.* Recent United States Supreme Court cases have abrogated its holding regarding employer liability for co-worker sexual harassment.

In *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 758-59 (1998), and *Faragher v. Boca Raton,* 524 U.S. 775, 799 (1998), cases decided after *Blankenship,* the United States Supreme Court clarified that employer liability for co-worker sexual harassment may be predicated upon its negligence with respect to both the discovery of and remedy for co-worker sexual harassment.

While employer liability for sexual harassment by supervisors and managing agents is derivative or vicarious, employer liability for co-worker sexual harassment is direct. *See Ellerth,* 524 U.S. at 758-59, 762-65. The employer is directly liable for its own negligence because its negligence has caused the harassment. *Id.* at 759.

■ The negligence standard of liability extends to both the employer's failure to discover and its failure to remedy co-worker sexual harassment. *See Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1035 (7th Cir. 1998).

> If the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have "adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy."

*Swenson v. Potter,* 271 F.3d 1184, 1192 (9th Cir. 2001) (quoting *Faragher,* 524 U.S. at 789).

In view of these principles, which we adopt, we hold that the trial court's instructions adequately explained the law of employer liability for co-worker sexual harassment. *See Simpson,* 144 N.H. at 574.

*B. Retaliation*

■ To prevail upon her retaliation claim under either Title VII or RSA chapter 354-A, the plaintiff had to demonstrate that: (1) she engaged in a statutorily-protected activity; (2) she suffered an adverse employment action; and (3) the protected activity and the adverse employment action were causally connected. *See Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 22 (1st Cir. 2002); *cf. Appeal of Montplaisir,* 147 N.H. 297, 300-01

(2001) (retaliation claim under New Hampshire Whistleblowers' Protection Act).

The defendant argues that the trial court's instructions about what constitutes an adverse employment action did not adequately explain the applicable law and could have misled the jury. *See Simpson*, 144 N.H. at 574.

The trial court instructed the jury that "[a]dverse employment actions may include actions by the employer including the preparation of an unwarranted negative employment evaluation and/or termination." The court further instructed that the defendant was liable for "the retaliatory acts of plaintiff's co-worker(s) if its supervisors knew or should have known of the co-worker(s)' retaliatory conduct and tolerated, condoned or encouraged it."

The defendant asserts that co-worker retaliation is not an "adverse employment action" upon which employer liability may be based. Alternatively, the defendant argues that the trial court's instruction permitted the jury to find the defendant liable for the retaliation of co-workers even if it lacked actual knowledge of the conduct.

We have not yet addressed what constitutes an "adverse employment action" under RSA chapter 354-A. We find federal law developed under Title VII instructive. *Cf. Montplaisir*, 147 N.H. at 300 (relying upon federal precedent under Title VII to construe retaliation claim under New Hampshire Whistleblowers' Protection Act).

The federal courts of appeal disagree as to what constitutes an "adverse employment action" under Title VII. The Fifth and Eighth Circuits have held that only "ultimate employment decisions," such as hiring, discharging, promoting and compensating, constitute "adverse employment actions." *See Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997).

By contrast, most other circuit courts have defined "adverse employment action" to include actions falling short of ultimate employment decisions. *See Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994); *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001); *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001); *Ray v. Henderson*, 217 F.3d 1234, 1240-41 (9th Cir. 2000); *Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998); *Wideman v. Wal-Mart Stores, Inc.* 141 F.3d 1453, 1456 (11th Cir. 1998).

Several circuits have held that, under appropriate circumstances, tolerating co-worker retaliation may constitute an adverse employment action. *See Marrero*, 304 F.3d at 26; *Stutler*, 263 F.3d at 703; *Richardson*, 180 F.3d at 446; *Gunnell*, 152 F.3d at 1264-65.

■We today join the majority of courts that have considered the issue and hold that actions falling short of ultimate employment decisions, such as tolerating co-worker retaliation, may constitute adverse employment actions under certain circumstances. As with a claim of co-worker sexual harassment, a plaintiff claiming co-worker retaliatory harassment must show that the harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment. *See Marrero*, 304 F.3d at 26; *Stutler*, 263 F.3d at 703; *Richardson*, 180 F.3d at 446; *Gunnell*, 152 F.3d at 1264-65. As with other kinds of "adverse employment actions," the plaintiff must also show that there is a causal connection between the co-worker harassment and the plaintiff's protected activity. *See Marrero*, 304 F.3d at 26; *Stutler*, 263 F.3d at 704.

Relying upon *Gunnell*, the defendant asserts that the standard for employer liability for co-worker retaliation is different from the standard for employer liability for co-worker sexual harassment. Whereas an employer may be liable for co-worker sexual harassment of which it knew or should have known, *see Butland*, 147 N.H. at 679, the defendant argues that an employer cannot be liable for co-worker retaliatory harassment unless it had actual knowledge of the conduct, *see Gunnell*, 152 F.3d at 1265.

The plaintiff in *Gunnell* argued that "because negligent employers may be held liable for *sexual harassment* by co[-]workers, negligent employers should be liable for *retaliation* by co-workers as well." *Id.* at 1263-64. The court rejected this argument on the ground that to impose liability upon an employer for retaliation, the employer must have acted intentionally, not negligently:

> [B]ecause harassment must be intentional on the part of the employer, we hold that an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions.

*Id.* at 1265.

■We believe that the court in *Gunnell* was misguided. We see no reason to impose a different standard for employer liability for co-worker harassment motivated by an employee's protected activity than for co-worker harassment motivated by an employee's protected status. Just as an employer may be liable for co-worker sexual harassment if the employer negligently fails to discover or remedy it, so too may an employer be liable for co-worker retaliatory harassment for negligently

failing to discover or remedy it. *See Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("there is nothing to indicate that the principle of employer responsibility [for co-worker harassment] does not extend equally to other Title VII claims, such as a claim of unlawful retaliation").

We conclude, therefore, that the trial court's instructions adequately explained the law with respect to whether co-worker retaliatory harassment may be an adverse employment action and whether an employer may be liable for co-worker retaliatory harassment of which it did not, but should have known. Because the defendant did not challenge the instructions on any other grounds, we express no opinion as to the adequacy of the instructions in any other respect.

## II. Motion for Judgment Notwithstanding Verdict

The defendant asserts that the trial court erroneously denied its motion for judgment notwithstanding the verdict with respect to the plaintiff's sexual harassment, retaliation and punitive damages claims.

"A party is entitled to judgment notwithstanding the verdict only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand." *Herman v. Monadnock PR-24 Training Council*, 147 N.H. 754, 758 (2002) (quotation omitted).

"The trial judge has very little discretion when deciding whether to grant the motion for judgment n.o.v." *Slattery v. Norwood Realty*, 145 N.H. 447, 448 (2000) (quotation omitted). The court cannot weigh the evidence or inquire into the credibility of the witnesses. *Id.* If the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the court must deny the motion. *Id.* at 448-49.

Our standard of review of a trial court's denial of a motion for judgment notwithstanding the verdict is "extremely narrow." *Weldy v. Town of Kingston*, 128 N.H. 325, 330 (1986). We will not overturn the trial court's decision absent an unsustainable exercise of discretion. *See Morrill v. Tilney*, 128 N.H. 773, 779 (1986); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). We limit our review of the jury's verdict to the grounds the defendant challenges on appeal and express no opinion as to its sufficiency in any other respect.

### A. Sexual Harassment

The defendant asserts that it was entitled to judgment notwithstanding the verdict on the plaintiff's sexual harassment claim because the evidence established that it promptly investigated her sexual harassment complaint

and took corrective action, which ended the harassment. Although there was evidence in the record to support these assertions, there was also evidence from which a reasonable jury could have found that the defendant's investigation and remedy were neither reasonable nor adequate under the circumstances. *See Butland*, 147 N.H. at 680.

There was evidence in the record from which a reasonable jury could have inferred that the defendant did not take the plaintiff's complaint seriously and did not formally or fully investigate it. For instance, Sprague testified that when he spoke to Richardson about the plaintiff's complaint, Richardson said, "he didn't think that we had to do anything because [the plaintiff] had said she didn't want anything done." Although Sprague eventually interviewed Danyew, he could not recall whether Richardson had told him to do this. Moreover, Sprague's notes of the interview show that he only partially investigated the plaintiff's complaint. According to the notes, Sprague asked Danyew about the six-pack of beer incident only, and did not ask about the shoulder-rubbing allegations.

There was also evidence that despite the defendant's policy requiring human resources involvement in all sexual harassment complaints, human resources was never contacted regarding the plaintiff's complaint. Although Richardson testified that he and Santaniello discussed the plaintiff's complaint with Ackerman, Ackerman testified that he had no recollection of these discussions. Sprague testified that human resources never contacted him about the plaintiff's complaint.

There was also evidence that the defendant never disciplined Danyew for his conduct. Although a note describing Sprague's interview of Danyew was placed in Danyew's file, the note did not indicate that Sprague counseled Danyew about the defendant's policy against sexual harassment or warned him that if he engaged in similar behavior in the future, he would be disciplined. Nor was there any mention of the plaintiff's complaint in Danyew's annual review for 1998, which stated that he followed "all rules and policies" and that he exceeded expectations in interpersonal relations. Danyew received a raise for 1998.

Viewing this evidence in the light most favorable to the plaintiff, we hold that a reasonable jury could have concluded that the defendant neither adequately investigated nor remedied the harassment of which the plaintiff complained. Accordingly, the trial court's decision to deny the defendant's motion for judgment notwithstanding the jury's verdict on the plaintiff's sexual harassment claims was sustainable on the record.

The defendant argues that its remedial response was sufficient, as a matter of law, because it stopped the harassment. *See Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999).

Because the defendant fired the plaintiff only seven days after responding to her complaint, we hold that a reasonable jury, in this case, could give little weight to the fact of the harassment ending. In this case, that the harassment ended after the defendant responded to the plaintiff's complaint did not entitle it to judgment as a matter of law.

## B. Retaliation

The defendant argues that judgment notwithstanding the verdict was appropriate with respect to the plaintiff's retaliation claims because there was insufficient evidence that the plaintiff was terminated for filing a sexual harassment complaint. We disagree.

There was sufficient evidence for a reasonable jury to conclude that the plaintiff met her *prima facie* burden. *See Montplaisir*, 147 N.H. at 301. It was undisputed that the plaintiff's complaint about Danyew was protected activity. Nor was there any dispute that the defendant terminated her eight days later. A reasonable jury could have relied upon the short period between the plaintiff's complaint and her termination to find the requisite causal connection. "A showing of discharge soon after the employee engages in [protected] activity . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110 (1st Cir. 1988).

There was also sufficient evidence from which a reasonable jury could have found that the plaintiff prevailed on her ultimate burden to prove, through circumstantial evidence or otherwise, that the true reason the defendant terminated her was to retaliate against her. *See Montplaisir*, 147 N.H. at 301. Although a reasonable jury could have found that the defendant successfully rebutted the plaintiff's *prima facie* case by producing evidence that it terminated her because of her poor attitude and performance, a reasonable jury could also have found that these proferred reasons were not credible. *See id.*

In addition to the short period of time between the plaintiff's complaint and her termination, the jury could have found the proferred reasons not credible because they conflicted with the evaluation the plaintiff received only two and a half weeks before the defendant terminated her. In her September 4, 1998 evaluation, Sprague stated that the plaintiff met expectations with regard both to her abilities and attitude.

A reasonable jury could also have found Sprague's testimony regarding the reasons he recommended terminating the plaintiff unbelievable, in light of evidence that he was harassing an hourly employee at the same time that he was investigating the plaintiff's sexual harassment claim and recommending her termination.

A reasonable jury could have inferred that one of the defendant's managers, Santaniello, believed that the termination was retaliatory. Santaniello testified that he was concerned that the plaintiff's termination might be perceived as retaliatory, but that he never investigated whether this was the case.

A reasonable jury could have inferred from Ackerman's testimony that Santaniello and others intentionally did not inform human resources that the plaintiff would be terminated only eight days after complaining about sexual harassment to keep human resources from discovering that the termination was retaliatory. Ackerman testified that neither he nor anyone else in human resources knew about the plaintiff's complaint until she filed it with the State Human Rights Commission. He further testified that had he known about the complaint, he would have investigated the termination to determine if it was retaliatory.

■ From all of the above, a reasonable jury could have inferred that the true reason for the plaintiff's termination was to retaliate against her for filing a sexual harassment complaint. *See id.* Thus, we hold that the trial court did not err by denying the defendant's motion for judgment notwithstanding the jury's verdict on the plaintiff's retaliation claims.

### C. Punitive Damages

Relying upon the United States Supreme Court's opinion in *Kolstad v. American Dental Assn.*, 527 U.S. 526 (1999), the defendant argues that the plaintiff was not entitled to punitive damages. The defendant asserts that not only was there insufficient evidence that it acted with the requisite malice and reckless indifference, but there was also "undisputed evidence" of its good-faith effort to comply with Title VII.

In *Kolstad*, the United States Supreme Court explained that "[t]he terms 'malice'. or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. The focus is thus upon the state of mind of the employer's managing agents. *See id.* at 535, 542-43. At a minimum, the employer must have discriminated "in the face of a perceived risk that its actions [would] violate federal law." *Id.* at 536.

■ Even if an employer's managing agent has acted with the requisite "malice" or "reckless indifference" to subject it to liability for punitive damages, an employer will be absolved from liability if the managing agent has acted contrary to the employer's good-faith efforts to comply with Title VII. *See id.* at 545. The First Circuit, and other federal courts, have ruled that the good-faith aspect of *Kolstad* is an affirmative defense upon

which the employer has the burden of proof. *Romano v. U-Haul Intern.*, 233 F.3d 655, 670 (1st Cir. 2000), *cert. denied*, 534 U.S. 815 (2001).

 There was evidence from which a reasonable jury could have found that the defendant's managing agents acted with reckless disregard for the plaintiff's right not to be sexually harassed. *See id.* at 669. Construed in the light most favorable to the plaintiff, evidence existed from which a reasonable jury could have inferred that Richardson told Sprague to do nothing about the plaintiff's sexual harassment complaint. There was also evidence that none of the defendant's managing agents counseled or disciplined Danyew for his conduct or complied with the company's directive that human resources be involved in all investigations of sexual harassment complaints.

There was also evidence from which a reasonable jury could have found that the defendant's managing agents acted with reckless disregard for the plaintiff's right not to be retaliated against for filing a sexual harassment complaint. *See id.* Viewed in the light most favorable to the plaintiff, evidence existed suggesting that Santaniello was aware that firing the plaintiff was retaliatory and that he failed to investigate or to inform human resources of his concerns.

A reasonable jury could also have concluded that the defendant failed to prove its good-faith efforts to comply with Title VII. *See id.* at 670. While there was evidence that the defendant has an anti-discrimination policy and that it periodically showed its employees videos about sexual harassment, the mere existence of an anti-discrimination policy or presentation of seminars on anti-discrimination laws does not automatically satisfy the good-faith requirement. *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir.), *cert. denied*, 531 U.S. 822 (2000). A defendant must also show its sincere commitment to enforcing its policy. *See id.*

There was evidence from which a reasonable jury could have concluded that the defendant was not committed to enforcing its anti-discrimination policy. Viewed in the light most favorable to the plaintiff, the evidence showed that the policy was not complied with in this case. Despite the policy's directives, there was evidence from which the jury could have found that no one notified human resources of the plaintiff's complaint, the complaint was not thoroughly investigated, the plaintiff was never informed of the results of the investigation, and the harasser was never disciplined for his conduct.

There was also evidence from which the jury could have inferred that the defendant did not train its supervisors and managers regarding their responsibilities to enforce the anti-discrimination policy. Sprague and

Richardson testified that the video was the only training they received about sexual harassment. Sprague testified that he received no specific training on the company's policy against sexual harassment when he became a supervisor.

Moreover, there was evidence that the defendant did not have a written policy regarding retaliation. There was also evidence that no one investigated whether the plaintiff's termination, occurring only eight days after she filed her complaint, was retaliatory. Construing this evidence in the light most favorable to the plaintiff, we hold that a reasonable jury could have concluded that the defendant failed to establish its good-faith efforts to comply with Title VII.

### III. Constitutional Challenge to Punitive Damages Award

The defendant argues that we must set aside or reduce the punitive damages award because it is grossly excessive in violation of the defendant's federal due process rights. See U.S. CONST. amend. XIV. The trial court reduced the punitive damages award to $300,000. The defendant contends that this award is excessive in light of the three guideposts identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). We disagree.

We review whether the punitive damages award violated the defendant's federal due process rights *de novo*. See *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431 (2001). We begin by observing that the "congressionally-mandated, statutory scheme identifying the prohibited conduct as well as the potential range of financial penalties goes far in assuring that [the defendant's] due process rights have not been violated." *Romano*, 233 F.3d at 673. That the punitive damages award in this case comports with the statutory cap under the Civil Rights Act of 1991 also "provides strong evidence that [the] defendant's due process rights have not been violated." *Id.* Nonetheless, we examine the award pursuant to the three guideposts set forth in *BMW*.

These guideposts are: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *BMW*, 517 U.S. at 574-75. These guideposts are intended to aid in determining whether the defendant received fair notice "not only of the conduct that will subject [it] to punishment but also of the severity of the penalty that a State may impose." *Id.* at 574. The guideposts, however, are not intended to be "an analytical straightjacket. . . . When all is said and done, a punitive damage award will stand unless it clearly appears that the amount of the

award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct." *Zimmerman v. Direct Federal Credit Union,* 262 F.3d 70, 81 (1st Cir. 2001).

### A. Reprehensibility of Conduct

To determine the reprehensibility of the defendant's conduct, the United States Supreme Court requires courts to examine whether: (1) the harm caused was physical, not economic; (2) the tortious conduct evinced indifference to or a reckless disregard to the health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated or isolated incidents; and (5) the harm was the result of intentional malice, trickery, deceit or mere accident. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 123 S. Ct. 1513, 1521 (2003).

The court in *BMW,* 517 U.S. at 576, found BMW's conduct insufficiently reprehensible because the only harm inflicted upon the plaintiff was economic and because BMW's conduct did not evince reckless disregard for the rights of others. Viewing the evidence in the light most favorable to the plaintiff, we conclude that the plaintiff in this case suffered more than just economic harm and, as previously discussed, the defendant's conduct evinced reckless disregard for the plaintiff's federally protected rights to be free from sexual harassment and retaliation. *See Romano,* 233 F.3d at 669.

The defendant fired the plaintiff only eight days after she complained of harassment, purportedly for poor performance and attitude, even though her most recent evaluation stated that she met expectations in these areas. The defendant never disciplined the harasser, but rather favorably evaluated him and gave him a raise. The individual who recommended terminating the plaintiff was himself later fired for sexual harassment. Despite a manager's concern that the termination could be perceived as retaliatory, no one investigated whether it was retaliatory. We conclude that, viewed in the light most favorable to the plaintiff, the defendant's conduct was "more reprehensible than would appear in a case involving economic harms only." *Id.* at 673.

### B. Ratio

The defendant argues that the punitive damage award for the plaintiff's sexual harassment claim, in particular, was excessive because it was thirty-five times the compensatory damage award on that claim. The defendant contends that the 5:1 ratio of punitive to compensatory damages for the plaintiff's retaliation claim is also excessive.

In *BMW*, 517 U.S. at 580, the court ruled that there must be a "reasonable relationship" between punitive and compensatory damages. In that case, the court was troubled by the 500:1 ratio between punitive and compensatory damages. *See id.* at 582-83. The court cautioned, however, against drawing "a mathematical bright line" that would fit every case, noting that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 582-83; *see Campbell*, 123 S. Ct. at 1524.

In *Romano*, the First Circuit ruled that a 19:1 ratio between punitive and compensatory damages was constitutionally acceptable due to the plaintiff's short period of employment and the low actual damages as well as the "difficulty in measuring actual damages in a case involving primarily personal injury." *Romano*, 233 F.3d at 673 (quotation omitted).

Similarly, in *Deters v. Equifax Credit Information Services*, 202 F.3d 1262, 1266, 1273 (10th Cir. 2000), the Tenth Circuit approved a punitive damages award of $295,000, which was fifty-nine times the compensatory award in the case, in part because of the company's reckless indifference to the plaintiff's sexual harassment complaints.

We hold that the ratios between punitive and compensatory damages in this case are constitutionally permissible in light of: (1) the plaintiff's relatively short period of employment (July to September 1998); (2) the difficulty in measuring actual damages where the injury is primarily personal; and (3) the evidence, when viewed in the light most favorable to the plaintiff, of the defendant's reckless indifference to her rights not to be sexually harassed or retaliated against. *Romano*, 233 F.3d at 673.

### C. Comparable Civil or Criminal Penalties

"The final *BMW* guidepost directs a reviewing court to assess the punitive damage award in light of the complex of statutory schemes developed to respond to the same sort of underlying conduct." *Zimmerman*, 262 F.3d at 82. The point of these comparisons is "solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall." *Id.* at 83. In this case, "the statutory scheme of Title VII and the punitive damages cap figures set out therein" fully notified the defendant of the potential liability to which it was subject. *Romano*, 233 F.3d at 674.

The defendant asserts that we should, instead, compare the punitive damages in this case to the remedies available under RSA chapter

354-A. RSA chapter 354-A does not permit the recovery of punitive damages, but does permit the New Hampshire Human Rights Commission to levy administrative fines. *See* RSA 354-A:21, II(d) (Supp. 2002). The defendant contends that the jury award in this case is excessive when compared to the maximum $10,000 fine, which could be levied against it under RSA chapter 354-A.

The defendant's reliance upon the remedies available under RSA chapter 354-A is misplaced. *See Romano*, 233 F.3d at 673-74. While the court in *BMW*, 517 U.S. at 583, urged deference to legislative judgments regarding the appropriate sanctions for the conduct at issue, we believe it most prudent to defer to the judgments embedded in Title VII, the statute upon which punitive damages were awarded. *See Zimmerman*, 262 F.3d at 83.

The defendant asserts that the punitive damages award was improperly influenced by evidence submitted about the value of its parent company. This issue is not properly before us, however, because the defendant did not raise it in the notice of appeal. *See State Farm Mut. Ins. Co. v. Pitman*, 148 N.H. 499, 503 (2002). We disagree with the defendant that this issue was subsumed within the questions raised in the notice of appeal. *See* SUP. CT. R. 16(3)(b).

*IV. Special Verdict Form*

The defendant argues that the special verdict form was faulty because it did not include questions regarding the defendant's affirmative defenses. We disagree.

A special verdict form must enable the court to determine which party is entitled to judgment. *See* 75B AM. JUR. 2D *Trial* § 1846 (1992). It "must be reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment." *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 699 (1st Cir. 2000) (quotation omitted). Moreover, it cannot be so confusing as to mislead the jury. *See Demetracopoulos v. Wilson*, 138 N.H. 371, 374 (1994). We examine the wording of the special verdict form, the court's jury instructions, and the evidence at trial to determine whether the special verdict form fairly presented the issues to the jury. *See id.* at 377-78; *Chadwick v. CSI, Ltd.*, 137 N.H. 515, 521-22 (1993).

The special verdict form in this case contained thirteen questions, five about the plaintiff's sexual harassment claim and eight about her retaliation claim. For each claim, the jury was asked first whether the defendant was liable for the claim at issue (sexual harassment or retaliation) and then a series of questions about damages.

Although the special verdict form did not include questions about the defendant's affirmative defenses, as the defendant admits, the court's general charge instructed the jury about them. The defendant does not argue on appeal that the court's instructions regarding its affirmative defenses were erroneous.

■■■ We hold that the instructions and the special verdict form, viewed together, were sufficiently clear with respect to the defendant's affirmative defenses. See *Johnson v. Teamsters Local 559*, 102 F.3d 21, 28 (1st Cir. 1996). The questions on the verdict form appropriately directed the jury to determine whether the plaintiff proved that the defendant was liable for sexual harassment or retaliation. The jury could not have found the defendant liable for either sexual harassment or retaliation if it had concluded that the defendant succeeded on its affirmative defenses. The questions on liability thus subsumed and incorporated questions regarding the defendant's affirmative defenses. See *Price v. Runyon*, 951 F. Supp. 52, 54 (D.N.J. 1996).

## V. Evidentiary Issues

The defendant argues that the trial court erroneously: (1) permitted the plaintiff to introduce evidence that Sprague was terminated in 1999 for sexual harassment; and (2) refused to permit the defendant to introduce evidence that the plaintiff's prior employer had received numerous complaints about her behavior.

We review the trial court's rulings on admissibility of evidence for an unsustainable exercise of discretion, reversing only if the rulings are clearly untenable or unreasonable to the prejudice of the defendant's case. See *MacDonald v. B.M.D. Golf Assocs.*, 148 N.H. 582, 584 (2002); *cf. Lambert*, 147 N.H. at 296.

### A. Sprague's Termination

Before trial, the defendant moved to preclude evidence that it terminated Sprague in August 1999 because an hourly employee alleged that he had an improper sexual relationship with her. On the first day of trial, the court denied the motion, stating that it would admit the evidence to show Sprague's motive in recommending the plaintiff's termination. The court also stated that if Sprague testified that he did not have a sexual relationship with this other employee, the plaintiff could call "a small number of witnesses" to impeach his credibility.

During the trial, when questioned by the plaintiff, Sprague admitted that the defendant had terminated him because of a sexual harassment claim brought by an hourly employee. Later, Santaniello testified that the

hourly employee alleged that Sprague began harassing her before he became a supervisor in August 1998. Santaniello further testified that if this allegation were true, then Sprague was harassing the hourly employee at the same time that he was investigating the plaintiff's sexual harassment claim and recommending her termination.

On appeal, the defendant argues that admitting this evidence violated New Hampshire Rule of Evidence 404(b).

Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Other bad act evidence is admissible when it is relevant for a purpose other than proving a person's character or disposition; there is clear proof that the person committed the act; and the probative value of the evidence is not substantially outweighed by its prejudice to the moving party. *See State v. Brewster*, 147 N.H. 645, 648 (2002); *Lapierre v. Sawyer*, 131 N.H. 609, 611-12 (1989) (applying same standard for admitting evidence under Rule 404(b) in civil cases as in criminal cases). The defendant challenges all three prongs of this test on appeal.

We cannot say that admitting the evidence was an unsustainable exercise of discretion. As the trial court found, the evidence was relevant to show that the plaintiff's termination was causally related to her sexual harassment complaint. Sprague, who was allegedly sexually harassing another employee at the time, was the person who recommended terminating the plaintiff.

With respect to the clear proof requirement, it is satisfied when the evidence shows that the person against whom the evidence is brought, and not some other person, committed the other bad act. *See State v. Lesnick*, 141 N.H. 121, 126 (1996). The trial court found that although the facts were disputed about whether the sexual relationship between Sprague and the hourly employee was consensual, "the evidence pretty clearly shows that there was a sexual relationship that preceded and continued after the events involving the plaintiff." This finding is supported by the record. *See id.* at 127.

Finally, we accord considerable deference to the trial court's determination in balancing prejudice and probative worth of evidence

under Rule 404(b), *see Brewster*, 147 N.H. at 650, and cannot say that the trial court in this case struck the wrong balance.

### B. Plaintiff's Prior Misconduct

The defendant sought to admit evidence that co-workers at the plaintiff's prior job complained about her conduct and "bad attitude." The defendant argued, at various points in the trial, that the plaintiff "opened the door" to the evidence by implying that she had difficulties with her co-workers and work performance because she was a victim of sexual harassment. The trial court disagreed.

"The opening-the-door doctrine allows a party to use previously suppressed or otherwise inadmissible evidence to counter a misleading advantage created by the opponent." *State v. Carlson*, 146 N.H. 52, 56 (2001). Because the trial court is in the best position to determine whether a party has "opened the door," we will not disturb its ruling absent an unsustainable exercise of discretion. *State v. Goodman*, 145 N.H. 526, 529 (2000); *cf. Lambert*, 147 N.H. at 296.

"For the opening-the-door doctrine to apply, the testimony at issue must have created a misimpression." *Goodman*, 145 N.H. at 529 (quotation omitted). The defendant argues that the plaintiff opened the door in her opening statement when she said that a witness would testify that it was "possible that someone who is being sexual[ly] harassed at work might experience performance problems." The defendant argues that the plaintiff again opened the door when the jury heard testimony from Ackerman and Santaniello that sexual harassment can affect an employee's work performance. Ackerman testified that sexual harassment can cause an employee to exhibit hostility towards co-workers and low productivity.

The record supports the trial court's determination that the plaintiff did not create a misimpression regarding the cause of her work performance problems. Further, the trial court permitted the defendant to rebut any misleading impression regarding the cause of the plaintiff's low productivity and hostility towards co-workers. For instance, the defendant was permitted to introduce evidence that co-workers complained about the plaintiff's poor attitude before she complained about sexual harassment. Under these circumstances, we hold that the trial court's ruling that the plaintiff did not open the door was a sustainable exercise of discretion. *See id.*

*Affirmed.*

BRODERICK, NADEAU, DALIANIS and DUGGAN, JJ., concurred.