Hillsborough-northern judicial district
No. 2003-099

MICHAEL PORTER

v.

CITY OF MANCHESTER & a.

Argued: February 4, 2004
Opinion Issued: May 14, 2004

*Backus, Meyer, Solomon & Branch, LLP*, of Manchester (*Jon Meyer* on the brief and orally), for the plaintiff.

*McDonough & O'Shaughnessy, P.A.*, of Manchester (*Robert J. Meagher* on the brief and orally), for defendant City of Manchester.

*Walker & Buchholz, P.A.*, of Manchester (*James G. Walker* on the brief and orally), for defendant Susan Lafond.

*Upton & Hatfield, LLP*, of Concord (*Heather M. Burns* and *Lauren S. Irwin* on the brief), and *Law Offices of Nancy Richards-Stower*, of Merrimack (*Nancy Richards-Stower* on the brief), for the New Hampshire Chapter of the National Employment Lawyers Association, as *amicus curiae*.

DUGGAN, J. The defendants, City of Manchester (city) and Susan Lafond, appeal a jury verdict in Superior Court (*Lynn*, J.) awarding the plaintiff, Michael Porter, compensatory and punitive damages for wrongful termination, *see Cloutier v. A. & P. Tea Co., Inc.*, 121 N.H. 915 (1981), and violation of 42 U.S.C. § 1983 (2000).

On appeal, the city argues that: (1) the trial court erred by refusing to instruct the jury on the doctrine of respondeat superior; (2) Porter failed to properly allege and prove his constructive discharge claim; (3) the trial court erred when it allowed Porter to recover emotional distress damages; and (4) the trial court erred when it permitted Porter to submit a claim for lost future earnings to the jury.

Lafond argues that: (1) the trial court erred when it granted Porter's request for punitive damages; (2) she was entitled to qualified immunity; (3) the trial court erred when it allowed Porter to request damages for violation of his State constitutional rights; (4) Porter failed to establish that, when he spoke out, he was motivated by the public interest; and (5) the trial court erred when it allowed Porter to introduce expert testimony.

We reverse the verdict against the city and remand for further proceedings consistent with this opinion. We affirm the verdict against Lafond.

## I. Facts

The jury could have found the following facts. In September 1997, Porter was hired as a caseworker in the city's Welfare Department (department). Lafond was the elected commissioner of the department. According to Lafond, Porter was a "great" caseworker.

As time passed, Porter became increasingly concerned about "certain office practices." Specifically, Porter was troubled that Lafond discouraged caseworkers from reporting client fraud, child abuse, child neglect and threats to public safety. In late 1999, Porter informally expressed his concerns to Mark Hobson, the city's human resources director. Porter was, however, unwilling to come forward, and, as a result, the issues he raised with Hobson were not communicated to Lafond.

In April 2000, after one of his clients committed suicide, Porter took a medical leave of absence. While on leave, Porter met with representatives of the human resources department. Porter shared his concerns about how Lafond was frequently absent from the office, discouraged caseworkers from reporting client welfare fraud, discouraged caseworkers from reporting public safety threats, and asked caseworkers, during the workday, to fill in at a nonprofit homeless shelter (where Lafond sat on the board of directors).

After the human resources department informed Lafond of Porter's complaints, she said that Porter "had to go." When he returned to work in May 2000, Lafond said to Porter, "[W]e'll see how long you last." Lafond also made Porter feel "very uncomfortable" by glaring at him, sticking her head into his office and ignoring comments he made at staff meetings. In the summer of 2000, Lafond physically bumped into Porter as they passed one another in the hallway. In addition, Lafond began to take a greater interest in Porter's cases.

In light of Porter's complaints, the city asked the Manchester Police Department to conduct an investigation of the welfare department. The police interviewed all of the department's employees, as well as Lafond. A written summary of the investigation was released in late June 2000. The police found it "highly unusual" that the department had not prosecuted any cases of welfare fraud under Lafond's administration. The police concluded, however, that there was "no evidence of [c]riminal conduct on the part of the City Welfare department [and/or] Commissioner Susan Lafond."

On July 5, 2000, Lafond issued a press release that was published in the local newspaper. In it, she stated that the police investigation had "completely cleared the department of any criminal conduct." She further

stated that the investigation was conducted because of allegations made by a "disgruntled welfare department employee."

Upset at being portrayed as a disgruntled employee, Porter prepared his own press release. His press release described Lafond as someone who "coddle[d]" a non-registered sex offender. According to Porter, however, the only portion of his press release that was published in the newspaper described an incident in which Lafond asked a department employee to accompany her to Worcester, Massachusetts to adopt a dog during the workday.

On July 18, 2000, Porter took a second leave of absence. At that time, he was experiencing a variety of physical symptoms that he attributed to workplace stress. Porter was unable to sleep and had difficulty concentrating. Porter also experienced headaches, diarrhea and vomiting.

While on leave, Porter was required by the city to avoid contact with department employees and to relinquish his keys to the welfare office. The city also asked Porter to participate in vocational testing and have a complete physical examination. Although there was discussion about transferring him to another department, the city did not offer Porter an alternative position.

Porter saw Dr. Calvin Genzel, a licensed psychologist, for vocational testing. In addition to completing a vocational assessment, Genzel diagnosed Porter as having a post-traumatic stress disorder and major depression.

While Porter was on leave, Lafond told her employees that human resources had "intervened and removed" him and that Porter's leave "was permanent and that he wasn't to have contact with [the] staff." At trial, Lafond claimed that she was simply relaying information that Hobson had given her regarding Porter's leave. Hobson, on the other hand, testified that he did not tell Lafond that Porter had left the department permanently. He did, however, authorize Lafond to hire a temporary replacement. During this same time period, Lafond told another department employee that if Lafond's son could, "he'd come down and take out about four or five people."

Porter returned to work on August 22, 2000. Lafond objected to Porter's return and told Hobson that she wanted "something in writing from a psychologist that said he was fit to return to duty, that he was emotionally stable to return to work." Lafond also objected to Porter's leave being charged to her budget. After a staff meeting on September 13, 2000, Lafond told an employee of the department that Porter "was sick and that he needs help and that he's in counseling and that he's out to destroy [Lafond]."

In an attempt to remedy the escalating situation in the department, the city hired Dr. Gerri King, an organizational psychologist, to facilitate a meeting between Lafond and her employees. Lafond refused to participate in "any exercise or seminar" sponsored by the city until she received a fitness for duty report on Porter from a mental health physician. As a result, the September 27, 2000 meeting with King was recast as a stress management session. During the meeting, Lafond sat away from the table, "rock[ed] in her chair and pound[ed] her feet into the floor." After the meeting, Lafond took an extended leave of absence.

While Lafond was on leave, the city met with her employees, including Porter, on several occasions. At a January 10, 2001 meeting, department employees shared their concerns with Ronald Robidas, the city's security manager, and Tom Jordan, coordinator of the city's Employee Assistance Program. After the meeting, Robidas and Jordan told Hobson that the employees had valid concerns and recommended developing a plan to help them deal with Lafond's return. Additionally, Robidas recommended that Lafond have a psychological evaluation. Mayor Robert Baines also met with Lafond's employees while she was on leave.

On February 1, 2001, Mayor Baines sent a letter to Lafond informing her that when she returned from leave, she would be required to perform her duties from City Hall, rather than from the welfare department. Mayor Baines issued this directive because "it would [] allow the employees to come into their work environment feeling secure in their workplace and would also allow [the city] to once again insist before the two parties got together that there was some facilitator that would help work through the issues."

Lafond chose to defy the Mayor's order. On the morning of February 2, 2001, Lafond arrived at the department with her son and her attorney. Robidas and Lieutenant Lussier of the Manchester Police Department intercepted Lafond upon her arrival. After being told that she would be arrested for criminal trespass if she attempted to enter the building, Lafond requested permission to retrieve some items from her office. Lafond went into her office briefly and left the building shortly thereafter.

The city then organized a series of mediation sessions, which were described as "very tense" and ultimately unsuccessful. According to Mayor Baines, the employees were willing to cooperate in the mediation process, but Lafond was not. Lafond, however, attributed the lack of success to the fact that the meetings were unstructured.

On April 23, 2001, Lafond returned to work. The city allowed her to work from the welfare department and did not place any restrictions on her with respect to how she handled personnel issues. When Lafond came

back from leave, Porter took a week-long vacation. He did not return to the department until April 30, 2001.

In May 2001, a series of events began that culminated in Porter leaving the department. On May 10, 2001, one of Porter's clients refused to go to a homeless shelter. Because the client's children would become homeless if the client refused to go to the shelter, Porter told the client that he would be required to report her to the New Hampshire Division for Children, Youth and Families (DCYF). The deputy director of the welfare department gave Porter permission to report the client to DCYF.

The following morning, Lafond met with Porter's client. After speaking with the client for approximately forty-five minutes, Lafond called Porter into her office. In front of the client, she told Porter that his referral to DCYF was inappropriate and refused to let him explain his decision.

Later that afternoon, Porter was working at the front desk when he looked up and saw Lafond staring at him. After retreating momentarily, Lafond returned to the front desk area and angrily told Porter that she was "the boss" and that Porter was not to call DCYF without her approval. Porter told Lafond that he was uncomfortable and needed to go to human resources. In response, Lafond told Porter that he was not leaving and blocked the doorway. Porter returned to his office and telephoned a human resources representative, who told him to "hang tight." Porter then resumed his duties at the front desk.

A few minutes later, Lafond and another department employee approached Porter. Lafond told Porter that he was suspended. Because Porter was waiting for human resources to return his call, he refused to leave the office. Instead, he returned to his office and called human resources for a second time. Lafond stood next to Porter while he was on the phone. After speaking with the acting director of human resources, Porter decided to leave. Lafond followed Porter down the hall as he exited the building.

Five days later, Porter saw Dr. Genzel. Porter complained of irritability, anxiety, worry, sleep problems, difficulty concentrating, tearfulness, low self-esteem and a fear of being hurt. Porter said that he felt overwhelmed, angry, numb and detached. Genzel opined that Porter was "on the verge of a nervous breakdown of some kind."

Initially, Porter filed an appeal of his suspension with the City of Manchester Board of Personnel Appeals (board). However, he withdrew the appeal because he "could never return ... to that department." Although Lafond did not officially terminate him, Porter alleged that her actions constituted a constructive termination of his employment.

Porter subsequently filed a complaint alleging that he had been wrongfully terminated by the city. He also brought a claim under 42

U.S.C. § 1983, alleging that Lafond violated "his constitutional rights of free speech, association, assembly and petition as protected by Part I, Articles 22 and 32 of the New Hampshire Constitution and the First Amendment to the United States Constitution" when she constructively terminated him in retaliation for his public criticisms of department practices. A jury trial was held in November 2002. The jury returned a verdict in Porter's favor. On the wrongful termination claim, the jury awarded $100,000 in compensatory damages. On the section 1983 claim, it awarded $300,000 in punitive damages against Lafond. This appeal followed.

## II. City's Arguments on Appeal

### A. Vicarious Liability

At trial, the city argued that its liability for Lafond's wrongful termination of Porter was predicated on the doctrine of respondeat superior. The trial court disagreed and ruled as a matter of law that the city was directly liable for Lafond's actions. As a result, the trial court refused to instruct the jury on the doctrine of respondeat superior. The city argues that this was error. We agree.

Jury instructions serve to identify issues of material fact, and to inform the jury of the appropriate standards of law by which to decide them. *Marcotte v. Timberlane/Hampstead School Dist.*, 143 N.H. 331, 347 (1999). A jury must be instructed adequately and accurately on the relevant law. *Meaney v. Rubega*, 142 N.H. 530, 532 (1997). We review jury instructions in context and will not reverse unless the charge, taken in its entirety, fails to adequately explain the law applicable to the case in such a way that the jury is misled. *Nilsson v. Bierman*, 150 N.H. 393, 400 (2003).

In prior cases, we have characterized the common law cause of action for wrongful termination as both a contract and a tort. *See Monge v. Beebe Rubber Co.*, 114 N.H. 130, 134 (1974) (contract action); *Cloutier*, 121 N.H. at 920 (tort action). In order to determine whether the city was entitled to an instruction on respondeat superior, we must definitively establish the theory of liability that underlies a wrongful termination action.

We have consistently recognized that the prevailing rule in employment law is that "in the absence of an employment contract, both parties [are] free at any time to terminate the employment relationship, with or without cause." *Cloutier*, 121 N.H. at 919 (reviewing the development of employment law since the early nineteenth century). This is commonly referred to as the at-will rule. *Id.* Nonetheless, in 1974, we carved out an exception to the at-will rule. *Monge*, 114 N.H. at 133. Specifically, in *Monge*, we held that "a termination by the employer of a contract of

employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract." *Id.* The rationale underlying our holding in *Monge* was that there is an implied covenant in every contractual relationship that the parties will carry out their obligations in good faith. *Cloutier*, 121 N.H. at 920. Therefore, we held that a wrongful termination cause of action sounds in contract. *See Monge*, 114 N.H. at 133-34.

In *Howard v. Dorr Woolen Company*, 120 N.H. 295, 297 (1980), we narrowly construed *Monge* "to apply only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." Accordingly, we held that a discharge due to sickness was not actionable under our public policy exception to the at-will rule. *Howard*, 120 N.H. at 297.

Then, in *Cloutier*, we synchronized our holdings in *Monge* and *Howard* and articulated a two-part test for wrongful termination claims. *Cloutier*, 121 N.H. at 921. "First, the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment." *Id.* "Second, the plaintiff must demonstrate that he was discharged because he performed an act that public policy would encourage, or refused to do something that public policy would condemn." *Id.* at 922. Notably, for the first time, we characterized wrongful termination as a cause of action in tort. *Id.* at 920.

After *Cloutier*, the combination of these two prongs resulted in a wrongful termination cause of action that was a "hybridization" of both contract and tort. *See Vandegrift v. American Brands Corp.*, 572 F. Supp. 496, 499 (D.N.H. 1983). The elements of bad faith, malice and retaliation in the first prong of the test follow contract law. *See id.* The public policy requirement in the second prong of the test clearly flows from tort law. *See id.*

Indeed, in *Hutton v. Essex Group, Inc.*, 885 F. Supp. 331, 332 (D.N.H. 1994), the United States District Court for the District of New Hampshire recognized that we have "neither spoken consistently nor clearly on the nature of the wrongful [termination] claim." Today, we resolve this issue, and, like the federal district court, we conclude that wrongful termination is a cause of action in tort. *Hutton*, 885 F. Supp. at 332.

"The fundamental difference between tort and contract actions lies in the nature of interests protected. Tort actions protect the interest in freedom from various kinds of harm. Contract actions protect the interest in having promises performed." *Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 841 n.14 (Wis. 1983). "Of course, there exists in every

contractual relationship an implied covenant that the parties will carry out their obligations in good faith. The implied covenant, however, is dependent upon the contractual relationship of the parties, and does not itself create an independent tort duty." *Vandegrift*, 572 F. Supp. at 499. Moreover, the "breach of an at-will employment contract standing alone would not normally give rise to a tort action." *Id.* "If, however, the facts constituting the breach of the contract also constitute a breach of a duty owed by the defendant to the plaintiff *independent* of the contract, a separate claim for tort will lie." *Id.*; *see also Lawton v. Great Southwest Ins. Co.*, 118 N.H. 607, 613 (1978).

 Our prior cases have imposed a duty upon the employer that exists independent of the at-will employment contract. Specifically, we have held that an employer may not terminate an employee for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn. *Cloutier*, 121 N.H. at 922. Moreover, a wrongful termination action is not designed to protect the employee's interest in having promises performed. Rather, it is designed to protect the employee from the harms that result from a wrongful discharge. We therefore hold that wrongful termination is a cause of action in tort.

Our holding today is in line with a majority of States that have considered this issue and characterize a wrongful termination claim based upon a violation of public policy as a cause of action in tort. *See, e.g., Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330, 1335 (Cal. 1980); *Frampton v. Central Indiana Gas Company*, 297 N.E.2d 425, 428 (Ind. 1973); *Nees v. Hocks*, 536 P.2d 512, 515 (Or. 1975); *Harless v. First Nat. Bank In Fairmont*, 246 S.E.2d 270, 275 n.5 (W. Va. 1978); *see also Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505, 512 (N.J. 1980) (recognizing cause of action in contract or tort or both).

Having determined that wrongful termination is a cause of action in tort, we must now decide whether the city was entitled to an instruction on the doctrine of respondeat superior.

We have previously held that a town's liability for the intentional tort of its town clerk is predicated upon the doctrine of respondeat superior. *Pierson v. Hubbard*, 147 N.H. 760, 766 (2002). Accordingly, *Pierson* dictates that because Porter has alleged an intentional tort, respondeat superior must be applied. The city's liability thus depends upon whether Lafond was acting within the scope of her employment when she wrongfully terminated him. *See id.*

Under respondeat superior, "an employer may be held vicariously responsible for the tortious acts of its employee if the employee was acting within the scope of his or her employment when his or her tortious act

injured the plaintiff." *Id.* Lafond's conduct falls within the scope of her employment if: (1) it is of the kind she is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the employer. *Id.*

■ In the present case, the trial court refused to instruct the jury on respondeat superior. Because we find that wrongful termination is a cause of action in tort and the city's liability is predicated upon the doctrine of respondeat superior, *see id.*, we conclude that the trial court erred by failing to apply respondeat superior in this case, *see Nilsson*, 150 N.H. at 400. We thus reverse the trial court's ruling with respect to the jury instruction on respondeat superior and remand for a new trial on Porter's wrongful termination claim against the city. Because the additional arguments that the city raised in its brief may arise again on remand, we address them now.

### B. Constructive Discharge

The city next argues that: (1) Porter failed to exhaust his administrative remedies; (2) Porter's constructive discharge claim was barred by the Workers' Compensation Law; and (3) Porter failed to allege or prove an objective basis for his constructive discharge.

The city first contends that because Porter failed to exhaust his administrative remedies, the trial court erred in denying its motion for summary judgment. Specifically, the city argues that Porter was required to appeal his suspension to the board before he could bring a constructive discharge claim in superior court.

When reviewing the denial of a motion for summary judgment, we consider the pleadings and any accompanying affidavits, and all proper inferences drawn from them, in the light most favorable to the nonmoving party. *Smart v. Am. Welding & Tank Co.*, 149 N.H. 536, 538 (2003). Summary judgment will be granted when there is no genuine issue of material fact to be decided, and the moving party is entitled to judgment as a matter of law. *Id.* We review the trial court's application of the law to the facts *de novo. Norwood Group v. Phillips*, 149 N.H. 722, 723 (2003).

The rule requiring exhaustion of administrative remedies is designed to encourage the exercise of administrative expertise, preserve agency autonomy and promote judicial efficiency. *Konefal v. Hollis/Brookline Coop. School Dist.*, 143 N.H. 256, 258 (1998). We have recognized that the exhaustion of administrative remedies doctrine is flexible, and that exhaustion is not required under certain circumstances. *Id.* Exhaustion is not required, for example, when further administrative action would be useless. *Id.* at 258-59.

■ This case falls within an exception to the general rule that administrative remedies must be exhausted prior to appealing to the courts. Even if Porter had followed through with his appeal and the board had rescinded his suspension, he would still have been required to work under Lafond's supervision. At trial, the city conceded that it lacked the authority to keep Lafond from retaliating against Porter. Moreover, at oral argument, we inquired as to whether the board had the authority to award back pay. The city said it "assumed" that the board had the authority to do so but could not categorically answer our question. Because the city has not demonstrated that further administrative action would have been useful, we affirm the trial court's ruling that exhaustion was not required.

Next, the city argues that because Porter's constructive discharge claim was barred by the Workers' Compensation Law, the trial court erred in denying its motion for judgment notwithstanding the verdict. *See* RSA 281-A:8, I(a) (1999) (amended 2001).

A party is entitled to judgment notwithstanding the verdict only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. *Madeja v. MPB Corp.*, 149 N.H. 371, 381 (2003). In deciding whether to grant the motion, the trial court cannot weigh the evidence or inquire into the credibility of witnesses. *Id.* If the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the court must deny the motion. *Id.* "Our standard of review of a trial court's denial of a motion for judgment notwithstanding the verdict is extremely narrow." *Id.* (quotation omitted). We will not overturn the trial court's decision absent an unsustainable exercise of discretion. *Id.*; *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

We previously addressed this issue in *Karch v. Baybank FSB*, 147 N.H. 525 (2002). In *Karch*, the defendant contended that the plaintiff's wrongful termination claim was barred by the Workers' Compensation Law. *Karch*, 147 N.H. at 537. Like Porter, the plaintiff in *Karch* alleged a constructive discharge, arguing that continual harassment in the workplace rendered her work environment so intolerable that she ultimately resigned. *Id.* at 536. We specifically rejected the defendant's argument that the plaintiff's claim was barred by the Workers' Compensation Law and held that the "better approach is to allow plaintiffs to allege wrongful discharge and recover for those injuries occurring after termination of the employment relationship." *Id.* at 537.

■ Our conclusion in the present case is dictated by our holding in *Karch*. As in *Karch*, we hold that Porter's constructive discharge claim is not barred by the Workers' Compensation Law. Accordingly, we reject the city's argument.

The city also argues that under an objective standard, no reasonable juror could have found sufficient evidence to support Porter's constructive discharge claim. Because this argument was raised in the city's motion for judgment notwithstanding the verdict, we apply the same standard of review as set forth above.

■ Constructive discharge occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign. *Id.* at 536. "Relatively minor abuse of an employee is not sufficient for a constructive discharge." 2 M. ROTHSTEIN ET AL., EMPLOYMENT LAW § 8.7, at 258 (1999). "Rather, the adverse working conditions must generally be ongoing, repetitive, pervasive, and severe." *Id.*

■ In the present case, the evidence was sufficient to prove the elements of a constructive discharge claim. When Porter returned to work after sharing his concerns with human resources, Lafond said to him, "[W]e'll see how long you last," and told Porter that she was disappointed in him. Lafond ignored suggestions that Porter made at staff meetings. In the summer of 2000, Lafond physically bumped into Porter as they passed each other in the hallway. Lafond also told an employee that if her son could, he would "take out" four or five people in the department. Lafond made "snickering comments" and glared at Porter. Finally, in May 2001, following a disagreement about the way Porter handled a case, Lafond told Porter that he was not leaving, blocked the doorway and suspended him.

The evidence presented at trial was sufficient to prove that Porter's working conditions were so difficult and intolerable that a reasonable person would feel forced to resign. *See Karch*, 147 N.H. at 536. Therefore, we find no unsustainable exercise of discretion in the trial court's denial of the city's motion for judgment notwithstanding the verdict.

### C. Emotional Distress Damages

The city argues that because Porter should not have been allowed to claim emotional distress damages, the trial court erred in denying its motion to set aside the verdict. In support of this argument, the city contends that: (1) Porter did not plead an emotional distress claim against the city; (2) emotional distress damages are not recoverable in a wrongful termination action, which sounds in contract; and (3) any alleged emotional injury claim is barred by the Workers' Compensation Law.

We will uphold a denial of a motion to set aside the verdict where there is sufficient evidence in the record to support the ruling. *Chisholm v. Ultima Nashua Indus. Corp.*, 150 N.H. 141, 144 (2003). We will not set aside a jury verdict unless it is conclusively against the weight of the evidence or if it is the result of mistake, partiality or corruption. *Id.*

The city first argues that Porter's pleadings failed to provide notice of his claim for emotional distress damages. It is well settled that a defendant is entitled to be informed of the theory on which the plaintiff is proceeding and the redress that he claims as a result of the defendant's actions. *Pike Industries v. Hiltz Construction*, 143 N.H. 1, 3 (1998). New Hampshire maintains a system of notice pleadings. *Id.* "As such, we take a liberal approach to the technical requirements of pleadings." *Id.* If, however, "the plaintiff has suffered damages that are not readily apparent from the facts alleged, those damages should be specifically stated." 4 R. WIEBUSCH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 7.21, at 178 (1997).

Here, paragraph fifty-one of Porter's writ states: "The actions taken against Porter by Lafond have caused him extreme emotional distress, render it impossible for him to return to work and constitute a constructive termination of his employment." The writ then alleges: "Porter's constructive termination was caused by [the city] through Lafond." The writ was sufficient to inform the city of the claims against it, as well as the redress that Porter was seeking. Consequently, we reject the city's argument.

The city also argues that emotional distress damages are not recoverable in a wrongful termination action, which sounds in contract. Porter, on the other hand, argues that because we have previously recognized wrongful termination as a cause of action in tort, emotional distress damages are recoverable.

> The measure of damages for wrongful [termination] depends on the theory of liability used to uphold the employee's claim. Traditional contract remedies are generally awarded when the discharge violated an express employment contract or a contract implied from the terms of an employee handbook or the parties' course of conduct. Except in a few states, tort remedies are awarded when the discharge violated public policy.

ROTHSTEIN, *supra* § 8.21, at 315.

As we explained at length above, our common law wrongful termination claim sounds in tort. Thus, traditional tort remedies, including

emotional distress damages, are generally recoverable. *See id.* Consequently, we reject the city's argument.

Third, the city argues that Porter's alleged emotional injury occurred at work and his claim is therefore barred by the Workers' Compensation Law. We previously decided this issue in *Karch. See Karch,* 147 N.H. at 537. In *Karch,* we held that an employee who has been wrongfully terminated may recover for those injuries occurring after termination of the employment relationship. *Id.* Like the plaintiff in *Karch,* Porter alleged that he was wrongfully terminated by the city. Thus, although the Workers' Compensation Law barred Porter from recovering for those injuries that arose in the course of his employment, our holding in *Karch* permits him to recover for those injuries that occurred after the constructive termination of his employment relationship with the city. *Id.*

### D. Lost Future Earnings

Finally, the city argues that because Porter's claim for lost future earnings should not have been submitted to the jury, the trial court erred in denying its motion to set aside the verdict. Specifically, the city contends that: (1) lost future earnings damages are not recoverable in this case since Porter was an at-will employee; (2) Porter failed to prove his lost future earnings claim with reasonable certainty; and (3) Porter failed to provide expert testimony to substantiate his claim. As set forth above, we will uphold the denial of a motion to set aside the verdict where there is sufficient evidence in the record to support the ruling. *Chisholm,* 150 N.H. at 144.

The city first argues that Porter could not recover for lost future earnings because he was an at-will employee. We disagree.

We have previously held that the usual rule of compensatory damages in tort cases requires that the person wronged receive a sum of money that will restore the person as nearly as possible to the position he or she would have been in if the wrong had not been committed. *Smith v. Cote,* 128 N.H. 231, 243 (1986). Moreover, a "wrongfully discharged employee who has found new employment is generally entitled to recover lost future earnings which represent the difference between what the employee would have earned from his former employer and what he can expect to earn from his new employer, if the future earnings are reasonably ascertainable." 82 AM. JUR. 2D *Wrongful Discharge* § 235, at 803 (2003).

Given that we have held that wrongful termination is a cause of action in tort, we conclude that Porter was entitled to submit his claim for lost future earnings to the jury. In a wrongful termination case, the recovery of lost future earnings will restore the employee as nearly as

possible to the position the employee would have been in if the employee had not been wrongfully terminated. *See Smith*, 128 N.H. at 243. Accordingly, we reject the city's argument that an at-will employee is barred from recovering lost future earnings.

Relying upon our decision in *Vachon v. New England Towing*, 148 N.H. 429 (2002), the city also contends that Porter failed to prove his lost future earnings claim with reasonable certainty. In *Vachon*, which was a personal injury action, we stated:

> While there is no fixed rule to calculate the amount of damages to be recovered for loss or diminution of earning capacity, the trier of fact may consider evidence that tends to show that as a result of the injury, the plaintiff's ability to earn money in the future has been impaired or diminished. While the damages need not be proven with mathematical certainty, most courts hold that in order to warrant a recovery for impairment of earning capacity in personal injury actions, the impairment of earning capacity must be shown with reasonable certainty or reasonable probability, and there must be evidence which will permit the jury to arrive at a pecuniary value of the loss.

*Vachon*, 148 N.H. at 433 (quotation omitted). We agree with the city that the principles underlying our holding in *Vachon* are applicable to the present case. Nonetheless, we disagree with the city's contention that Porter failed to prove his lost future earnings claim with reasonable certainty.

At trial, Porter introduced a chart into evidence that summarized his lost future earnings. The first column outlined what Porter would have earned if he had remained at the department. The second column listed Porter's actual earnings since he left the department. The final column demonstrated the difference between what Porter would have earned if he had remained at the department and what he was actually earning. Specifically, Porter estimated that his total lost wages between May 2001 and December 2002 totaled $23,954 and his lost future earnings equaled $9,236 per year.

We hold that Porter proved his lost future earnings claim with reasonable certainty. Although he did not prove the amount of his lost future earnings with mathematical certainty, his chart provided the jury with enough information to allow them to arrive at a pecuniary value for his loss. *See id.*

Likewise, we reject the city's argument that Porter was required to provide expert testimony to substantiate his lost future earnings claim.

Expert testimony is required only where the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson. *Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454, 460 (2003). Here, the calculation of Porter's lost future earnings was not so complex as to be beyond the ken of the average layperson. Porter had personal knowledge of how much he earned when he was working at the welfare department, as well as how much he was earning at his new job. Therefore, under the facts of this case, we conclude that expert testimony with respect to Porter's lost future earnings was not required.

We decline to address the city's remaining arguments with respect to Porter's lost future earnings claim because they are either cursory in nature or are wholly lacking in merit. *State v. Higgins*, 149 N.H. 290, 302 (2003).

### III. Lafond's Arguments on Appeal

#### A. Punitive Damages

Lafond first argues that Porter should not have been allowed to request punitive damages because he did not allege such damages prior to the start of trial. Thus, Lafond argues that the trial court erred in denying her motion for judgment notwithstanding the verdict.

As set forth above, a party is entitled to judgment notwithstanding the verdict only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. *Madeja*, 149 N.H. at 381. We will not overturn the trial court's decision absent an unsustainable exercise of discretion. *Id.*; *cf. Lambert*, 147 N.H. at 296 (explaining unsustainable exercise of discretion standard).

42 U.S.C. § 1983, which is derived from the Civil Rights Act of 1871, "was intended to create a species of tort liability in favor of persons deprived of federally secured rights." *Smith v. Wade*, 461 U.S. 30, 34 (1983) (quotation omitted). It is well-established that "a jury [is] permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56. It is "likewise generally established that individual public officers [are] liable for punitive damages for their misconduct on the same basis as other individual defendants." *Id.* at 35.

Lafond argues that because Porter failed to provide her with notice of his intention to seek an award of punitive damages, the trial court erred

when it permitted Porter to request punitive damages in his closing statement. Porter, on the other hand, argues that since he alleged a cause of action under section 1983, and that statute "has always been understood to give the plaintiff the right to request punitive damages," Lafond had notice that he might request punitive damages. We agree.

In his writ, Porter brought a cause of action under section 1983, alleging that Lafond had violated his First Amendment rights by retaliating against him for his public criticisms of department practices. Porter further alleged that Lafond "followed a strategy of attempting to force [him] to resign by engaging in repeated acts of hostility toward him." He also alleged that Lafond engaged in a number of retaliatory acts against him. These allegations, in conjunction with the well-established principle that punitive damages may be assessed in a section 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others, were sufficient to put Lafond on notice that punitive damages could be requested and assessed.

In reaching this conclusion, we find that Lafond's reliance upon Superior Court Rule 62 and our holding in *Welch v. Gonic Realty Trust Co.*, 128 N.H. 532 (1986), is misplaced.

Rule 62 states that, prior to trial, a presiding justice may order the parties to file pre-trial statements. *Super. Ct. R.* 62. When ordered, a pre-trial statement must include specific claims of liability, as well as a specification of injuries with a statement as to which, if any, are claimed to be permanent. *Id.*

In *Welch*, we stated that the purpose of Rule 62 was two-fold. *See Welch*, 128 N.H. at 535. We first noted that Rule 62 "has as its primary purpose the promotion of settlement." *Id.* We further noted that an additional purpose of the rule is that of eliminating surprise in those cases which must actually proceed to trial. *Id.* "Surprise must be something unexpectedly arising under circumstances which the party was not reasonably called upon to anticipate, and which ordinary prudence and foresight could not guard against." *Id.* (quotation and ellipsis omitted).

Here, Porter's request for punitive damages did not violate Superior Court Rule 62 or the principles we articulated in *Welch*. Porter's pre-trial statement alleged that Lafond had violated his constitutional rights by retaliating against him for his public criticisms of department practices. With respect to specification of his injuries, Porter alleged that he "suffered severe emotional distress and severe physical manifestations of that emotional distress." The allegations Porter made in his pre-trial statement, as well as the fact that he brought his claim under section 1983,

were sufficient to put Lafond on notice that Porter might request punitive damages. Furthermore, Porter's request for punitive damages cannot be characterized as unexpected. Porter's request was something that Lafond could reasonably be called upon to anticipate. We therefore find no unsustainable exercise of discretion in the trial court's denial of Lafond's motion for judgment notwithstanding the verdict.

### B. Qualified Immunity

Lafond next argues that the trial court erred by rejecting her qualified immunity defense. Prior to jury deliberations, the trial court ruled as a matter of law that because "this is an area of the law that's pretty clear," Lafond should have known that she was violating Porter's rights. The trial court thus ruled that Lafond was not entitled to qualified immunity.

The trial court's denial of qualified immunity is a legal question that we review *de novo. Jarrett v. Town of Yarmouth*, 331 F.3d 140, 146 (1st Cir.), *cert. denied*, 124 S. Ct. 573 (2003). "When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial." *Id.* at 147 (quotation omitted).

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quotation omitted). "As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Accordingly, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

Drawing upon United States Supreme Court precedent, the First Circuit employs the following three-part test to determine whether a public official is entitled to qualified immunity: (1) whether the plaintiff has established a constitutional violation; (2) whether that right was clearly established at the time of the violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue. *See Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004). We address each of these issues in turn.

### 1. Constitutional Violation

The following factors must be considered in order to determine whether Porter has established a violation of his First Amendment rights: (1) whether the speech involves a matter of public concern; (2) whether, when

balanced against each other, the First Amendment interests of Porter and the public outweigh the government's interest in functioning efficiently; and (3) whether the protected speech was a substantial or motivating factor in the adverse action against Porter. *Id.*

### a. Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

In April 2000, Porter told human resources that he was concerned that Lafond: (1) was frequently absent from the office; (2) discouraged caseworkers from reporting client welfare fraud; (3) discouraged caseworkers from reporting public safety threats; and (4) asked caseworkers to fill in at a nonprofit homeless shelter. Porter's speech directly implicated a topic of inherent concern to the community; namely, the efficient and effective management and operation of the city government. *See, e.g., Considine v. Board of County Com'rs*, 910 F.2d 695, 700 (10th Cir. 1990) (concluding that statements "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties" constituted speech that touched on a matter of public concern (quotation omitted)). Thus, we conclude that Porter's speech involved a matter of public concern, satisfying the first prong of the constitutional violation analysis.

### b. Balancing the Interests

The next step in determining whether Lafond violated Porter's constitutional rights is to balance the interests of Porter and the public in Porter's speech "against the interest of the [city], as an employer, in promoting the efficiency of the public services it performs through its employees." *Mihos*, 358 F.3d at 103 (quotation and ellipsis omitted). Because a balancing of the interests is derived from the seminal United States Supreme Court case of *Pickering v. Board of Education*, 391 U.S. 563 (1968), this is commonly referred to as "*Pickering* balancing." *See Mihos*, 358 F.3d at 103.

Porter's speech focused upon alleged abuses of public office on the part of Lafond, who was an elected official. The United States Supreme Court "has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick*, 461 U.S. at 145 (quotation omitted). The strong public interest in such disclosures weighs heavily "in favor of First Amendment protection against retaliation for [the plaintiff's] speech."

*O'Connor v. Steeves*, 994 F.2d 905, 916 (1st Cir.), *cert. denied*, 510 U.S. 1024 (1993).

On the other side of the *Pickering* balance, we must consider Lafond's interest "in preventing unnecessary disruptions and inefficiencies in carrying out [the department's] public service mission." *Mihos*, 358 F.3d at 103 (quotation omitted). Although Lafond adduced evidence of considerable disruption in the department, she has failed to demonstrate that the disruption was attributable to the exercise of Porter's First Amendment rights. *See O'Connor*, 994 F.2d at 916. On the contrary, the evidence suggests that when Porter shared his concerns with human resources, he did so in a responsible, low-key manner that was designed to minimize any potential disruption to the efficient operation of the department.

Further, the evidence suggests that any disruption to the efficient operation of the department was the result of the way Lafond responded to Porter's complaints. In the summer of 2000, Lafond told a department employee that if her son could, "he'd come down and take out about four or five people." Moreover, at the September 2000 meeting with Dr. King which was designed to ameliorate the situation, Lafond was at least disengaged and arguably uncooperative. Finally, in February 2001, Lafond attempted to return to her office despite the Mayor's request that she work from City Hall. Accordingly, we conclude that the *Pickering* balance weighs heavily in favor of Porter's and the public's interests.

### c. Substantial Factor

We now consider whether Porter's speech was a substantial factor in Lafond's decision to constructively terminate him. *See Mihos*, 358 F.3d at 108. Specifically, we must determine whether Porter's constructive termination "was attributable to his exercise of his First Amendment rights or to some other reason unrelated to his [speech]." *Id.*

The record indicates that before Porter shared his concerns with human resources, Lafond felt that he was a "great" caseworker. After being informed of his complaints, however, Lafond underwent an abrupt change of opinion. When human resources told Lafond about Porter's concerns, Lafond responded that Porter "had to go." Later, when Porter returned from his medical leave, Lafond said, "[W]e'll see how long you last." She also began glaring at Porter, sticking her head into his office and ignoring his comments at staff meetings. The temporal proximity between Porter's speech and Lafond's actions cannot be ignored. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (stating that in action under Americans with Disabilities Act, temporal proximity of employee's protected activity to employer's adverse action is circumstantial evidence

of retaliation), *cert. denied*, 504 U.S. 985 (1992). Given the evidence that was presented at trial, we conclude that Porter's speech was a substantial factor in Lafond's decision to constructively terminate him.

In sum, with respect to the three factors that comprise the first prong of the qualified immunity test, we conclude that: (1) Porter's speech involved a matter of public concern; (2) Porter's interest and the public's interest weigh more heavily in the *Pickering* balancing test than Lafond's interest in the efficient operation of the department; and (3) Porter's speech was a substantial factor in Lafond's decision to constructively terminate him. We therefore hold that Porter has established a violation of his First Amendment rights.

### 2. Clearly Established Right

We now turn to the second part of the qualified immunity test, whether Porter's First Amendment rights were clearly established at the time Lafond constructively terminated him.

"The inquiry into the nature of a constitutional right for the purpose of ascertaining clear establishment seeks to discover whether the right was reasonably well settled at the time of the challenged conduct." *Mihos*, 358 F.3d at 109 (quotation and ellipsis omitted). "Additionally, the inquiry into whether the right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quotation omitted).

As set forth above, the United States Supreme Court "has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick*, 461 U.S. at 145 (quotation omitted). Furthermore, it is well-settled law that public employees cannot constitutionally be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering*, 391 U.S. at 568. Nonetheless, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146. The sometimes difficult role of the courts "is to seek a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 142 (quotation and brackets omitted).

Lafond argues that because the analysis of First Amendment claims is intensely fact-specific and does not lend itself to clear bright-line rules, she

was not on notice that her actions were unlawful. In our view, however, this case presents circumstances that permit us to conclude that the law was clearly established at the time of Lafond's constructive termination of Porter.

We recognize that in cases involving a balancing of the interests, the application of the law is frequently "so fact dependent" that the law can rarely be considered clearly established. *See Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.), *cert. denied*, 479 U.S. 848 (1986); *see also Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992). The present case, however, is close to *Pickering* itself. In *Pickering*, the United States Supreme Court "held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds." *Connick*, 461 U.S. at 145. Here, Porter was constructively terminated for criticizing Lafond's absences, as well as the department's failure to report client welfare fraud and threats to public safety. Thus, like the plaintiff in *Pickering*, Porter's speech directly implicated a topic of inherent concern to the community. Consequently, even though this case involves a balancing of the interests, we conclude that Lafond should have been aware that Porter's First Amendment right to speak out was clearly established. *See Suboh v. District Attorney's Office of Suffolk*, 298 F.3d 81, 94 (1st Cir. 2002) (finding that a constitutional right was clearly established even though the court was unable to find a case "exactly on all fours" with the facts of the case before it).

In addition, Lafond acted with full knowledge that she was violating Porter's rights. On several occasions, people from the human resources department met with Lafond and advised her not to terminate Porter for his speech. Lafond even admitted consulting her own attorney about what actions she could take in response to Porter's speech. At trial, Lafond testified that her attorney told her not to reprimand Porter for his speech because it was "a legal matter."

Based upon the evidence that was presented at trial, we conclude that Porter's First Amendment right to speak out was clearly established at the time of his constructive termination.

### 3. The Understanding of a Reasonable Official

The third step in the qualified immunity analysis "requires us to analyze whether an objectively reasonable officer in [Lafond's] position would have understood her action to violate [Porter's] rights." *Mihos*, 358 F.3d at 110 (quotation and brackets omitted). In other words, even though we have already concluded that Porter has established a constitutional violation, if

Lafond's mistake as to what the law required is reasonable, then she is entitled to the qualified immunity defense. *See Saucier*, 533 U.S. at 205.

We conclude that a reasonable official similarly situated to Lafond would have known that her constructive termination of Porter in retaliation for his speech violated his constitutional rights. Importantly, as we set forth above, the law is well-settled that public employees cannot constitutionally be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering*, 391 U.S. at 568. Moreover, Lafond's own attorney told her that she should not reprimand Porter because it was a "legal matter." Human resources also advised Lafond not to terminate Porter. Despite these warnings, Lafond engaged in a campaign to force Porter out of the department. Under these circumstances, no "reasonable public official could have failed to realize that a member of a public instrumentality cannot be terminated" for speaking out on matters of public concern. *See Mihos*, 358 F.3d at 110; *see also Suboh*, 298 F.3d at 95-96.

 Having found that: (1) Porter has established a violation of his First Amendment rights; (2) the right was clearly established at the time Lafond constructively terminated him; and (3) a reasonable public official would have known that the constructive discharge constituted a constitutional violation, we conclude that the trial court correctly ruled that Lafond is not entitled to qualified immunity.

### C. State Constitutional Rights

Lafond challenges the trial court's instruction that Porter was entitled to damages for violation of his State constitutional rights. Porter counters that Lafond did not object to the disputed jury instruction before the jury retired, and, therefore, she waived her right to raise this issue on appeal. We agree.

It has been long recognized in this jurisdiction that a specific, contemporaneous objection is required to preserve an issue for appellate review. *Berliner v. Clukay*, 150 N.H. 80, 82 (2003). This requirement is grounded in both judicial economy and common sense, affording the trial court the opportunity to correct an error it may have made, or clearly explain why it did not make an error. *Id.* at 82-83. Providing the trial court with the opportunity to correct error is particularly appropriate when an alleged error involves a jury instruction. *Id.* at 83.

 When the trial court charged the jury, it said: "Plaintiff claims that his rights were violated by the defendants when he was constructively discharged from his employment in retaliation for the exercise of his rights to freedom of speech and to petition the government under the New

Hampshire and the United States Constitutions." Before the jury retired, the trial court asked if there were objections to the charge. Lafond made three objections to the charge. She did not, however, object to the aforementioned instruction. Consequently, we conclude that Lafond's argument was not preserved for appellate review.

### D. Expert Testimony

Next, Lafond argues that the trial court erred when it allowed Dr. Genzel to testify as an expert for Porter. Specifically, Lafond contends that Porter's failure to make timely and meaningful disclosures deprived her of a meaningful opportunity both to consult with an expert before Genzel's deposition and to secure rebuttal testimony from an expert to be used at trial.

In superior court, a party is entitled to disclosure of the opposing party's experts, the substance of the facts and opinions about which they are expected to testify and the basis of those opinions. *McLaughlin v. Fisher Eng'g*, 150 N.H. 195, 202 (2003); *see also* SUPER. CT. R. 35(f). Failure to supply this information may result in exclusion of the expert testimony unless good cause is shown to excuse the failure to disclose. *McLaughlin*, 150 N.H. at 202. The admission or exclusion of expert testimony is within the trial court's sound discretion. *In the Matter of Letendre & Letendre*, 149 N.H. 31, 37 (2002). The preface to the superior court rules allows the trial court to waive the application of any rule as good cause appears and as justice may require. *Whitaker v. L.A. Drew*, 149 N.H. 55, 58 (2003).

In April 2002, the parties agreed that Porter had until June 1, 2002, to disclose his expert witnesses. In a July 22, 2002 letter, Porter's counsel informed Lafond that although he had not retained any expert witnesses to testify in the case, he planned "to call Dr. Genzel to testify in regard to his treatment of Mr. Porter, his assessment of Mr. Porter's condition, the causation for the condition and his prognosis." On August 12, 2002, Porter provided Lafond with clinical records of Genzel's treatment of Porter. Then, on October 9, 2002, Lafond deposed Genzel. According to Lafond, she first became aware that Porter planned to call Genzel as an expert during Genzel's deposition.

Despite Porter's characterization of Genzel as a lay witness in his July 2002 letter, we agree with Lafond that because Genzel testified about subjects that are generally not within the common knowledge of the general public, he testified as an expert witness. *See State v. Martin*, 142 N.H. 63, 65 (1997) (stating that an expert witness is one who testifies concerning matters of scientific, mechanical, professional or other like nature, which requires special study, experience, or observation not within the common knowledge of the general public). However, we disagree with

Lafond's contention that the trial court was required to exclude Genzel's testimony.

■ Porter told Lafond in July 2002, approximately four months before trial and two-and-a-half months before Genzel's deposition, that he intended "to call Dr. Genzel to testify in regard to his treatment of Mr. Porter, his assessment of Mr. Porter's condition, the causation for the condition and his prognosis." In October 2002, Lafond had the opportunity to depose Genzel. In addition, Porter listed Genzel as a possible witness in his pre-trial statement and provided Lafond with a copy of Genzel's clinical records. Thus, although we are troubled by Porter's apparent failure to disclose Genzel as an expert in a timely fashion, we conclude that the trial court did not commit an unsustainable exercise of discretion when it denied Lafond's motion *in limine* and permitted Genzel to testify as an expert at trial.

### E. Porter's Motivation

Lafond contends that she was entitled to a judgment notwithstanding the verdict because Porter failed to establish that, when he spoke out, he was motivated by the public interest rather than a private interest. Thus, Lafond argues that Porter's speech was not entitled to First Amendment protection. While it is unclear from her brief, we assume that Lafond is contending that because Porter's speech was not entitled to constitutional protection, he failed to establish a violation of section 1983. Given our First Amendment analysis above, we decline to further address Lafond's contentions.

### F. Lafond's Remaining Arguments

Lafond argues that the trial court erred when it permitted Porter to submit a claim for lost future earnings to the jury. Because we addressed this argument at length in part II(D) above, we decline to revisit it here. We have considered Lafond's remaining arguments and decline to address them because they are either cursory in nature or are wholly lacking in merit. *Higgins*, 149 N.H. at 302.

*Reversed in part; affirmed in part; and remanded.*

NADEAU and DALIANIS, JJ., concurred.