Belknap
No. 2005-686

GLORIA JEAN LACASSE

v.

SPAULDING YOUTH CENTER

Argued: July 20, 2006
Opinion Issued: October 13, 2006

*Normandin, Cheney & O'Neil, PLLC*, of Laconia (*James F. Lafrance* and *James W. Kennedy* on the brief, and *Mr. Lafrance* orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Mark T. Broth* and *Nancy E. Boudreau* on the brief, and *Mr. Broth* orally), for the defendant.

HICKS, J. The plaintiff, Gloria Jean Lacasse, appeals an order of the Superior Court (*Smukler*, J.) granting summary judgment to the defendant, Spaulding Youth Center (Spaulding), in this wrongful discharge action. We affirm in part, reverse in part and remand.

The trial court relied upon the following facts, as alleged by the plaintiff. Spaulding is a non-profit residential facility for emotionally-impaired and autistic children. The plaintiff was employed by Spaulding as assistant food service director, where she worked directly under the food service director, Christine Couto, and filled in as director in Couto's absence. Also employed in the kitchen were Couto's daughters, Wendy and Michelle.

From the commencement of her employment in September 1999 through August 2001, the plaintiff had an excellent relationship with Spaulding and Couto and good working relations with the other kitchen staff. On August 24, 2001, while filling in for Couto, the plaintiff refused to submit time sheets to payroll because she questioned Michelle and Wendy Couto's hours. Instead, she left the task for Couto's return on August 27, 2001.

On September 4, the plaintiff noticed that Michelle's time sheet had been filled out, in her view, inaccurately. The plaintiff voiced her concerns to Couto. That same day, Couto "yelled at the plaintiff for making a peanut butter sandwich wrong," and gave her the cold shoulder.

The next day, Couto's treatment of the plaintiff returned to normal. On September 6, however, the plaintiff relayed to Couto a concern about Wendy taking food home from the kitchen. Couto again treated the plaintiff gruffly for the next two days and failed to provide her with specific work assignments. Thereafter, Couto chastised the plaintiff while she was serving food to residents and employees and yelled at her "for several minutes" about a snack she had served.

On September 17, 2001, the plaintiff received her annual performance review from Couto. Couto was critical of the plaintiff's job performance, and her written review was less satisfactory than it had been in previous years. In addition, Couto told the plaintiff she could no longer leave early on Friday afternoons. The next day, another employee told the plaintiff that Couto had disclosed her performance evaluation to Wendy.

The plaintiff informed Spaulding's human resources department on September 18 that she was having a problem with Couto, and filed a complaint the next day. On September 20, Darnell Pestana, the director of human resources, informed the plaintiff that an investigation was underway. The plaintiff also consulted a doctor that day regarding various physical symptoms she attributed to stress.

On October 1, the plaintiff tendered her letter of resignation, giving two weeks notice. The next day, Pestana called the plaintiff and asked her to

reconsider resigning and give Spaulding a chance to investigate her complaint. Pestana told the plaintiff she could take two weeks paid administrative leave and that additional time might be available. She also informed the plaintiff that an investigation could take longer than two weeks. The plaintiff took the two-week paid leave.

On October 12, the plaintiff informed Spaulding that she had hired an attorney and would not return to work. Her attorney then asked Spaulding to stay the plaintiff's resignation, with or without pay, pending investigation of her claims and clarification regarding her state of health. Spaulding agreed, giving the plaintiff until October 26, 2001, to rescind her resignation, but requiring her to provide a medical release as a condition of returning to work. On October 26, the plaintiff informed Spaulding that her resignation would be effective immediately because her doctor had advised her not to return to work.

The plaintiff sued for, among other things, wrongful discharge and negligent supervision. Spaulding moved for summary judgment. The court granted summary judgment on the wrongful discharge claim, finding that the incidents of mistreatment alleged by the plaintiff "do not rise to the level of constructive discharge." The court also granted summary judgment on the negligent supervision claim, finding it barred by the workers' compensation statute. *See* RSA 281-A:8 (Supp. 2005). The plaintiff appeals.

Our standard of review is well established:

> When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. If our review of the evidence does not reveal a genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision. We review the trial court's application of the law to the facts *de novo*.

*White v. Asplundh Tree Expert Co.*, 151 N.H. 544, 547 (2004) (citations omitted).

 We first address the plaintiff's wrongful discharge claim. To succeed on such a claim, a plaintiff must prove: "(1) [that] the termination of employment was motivated by bad faith, retaliation or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." *Karch v. BayBank FSB*, 147 N.H. 525, 536 (2002). The termination element of the claim may be satisfied by proof of a

constructive discharge, *see id.*, which "occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign," *id.* (quotation omitted). Constructive discharge is not established by showing "[r]elatively minor abuse of an employee[;] . . . [r]ather, the adverse working conditions must generally be ongoing, repetitive, pervasive, and severe." *Porter v. City of Manchester*, 151 N.H. 30, 42 (2004) (quotations omitted).

The plaintiff argues that the trial court erred in ruling as a matter of law that no reasonable person in the plaintiff's position would have felt compelled to resign from Spaulding. Although she cites a number of alleged errors in the court's analysis of the evidence, we need only address one; namely, that the court "failed to address or even mention important evidence similar in nature to the veiled threat that was identified by the [Supreme] Court as an element of the constructive discharge found in *Porter*." *See id.* (plaintiff's superior said "We'll see how long you last" after plaintiff expressed concerns about her to human resources (quotation omitted)).

In the case before us, the plaintiff testified that Couto told her, during her interview for the job, that "with everybody she hires, she let's [*sic*] them know right away that if she comes across anything she dislikes about the . . . person or persons, she makes it miserable enough for them to quit, that she does not fire anyone." Moreover, that comment was Couto's response to the plaintiff's inquiry as to why the prior assistant director had left the position. While working at Spaulding, the plaintiff heard about other employees who had resigned due to their treatment by Couto. Pestana, during her investigation of the plaintiff's complaint, spoke to a former kitchen employee who said she left the kitchen because of Couto's mistreatment and who named others she claimed had been driven out by Couto. The trial court's order fails to mention this evidence.

The court concluded that "[w]hile the working conditions faced by [the plaintiff] were not ideal, being ignored by one's supervisor and being yelled at three times in two weeks does not rise to the level of creating an intolerable working condition that would force a reasonable person in the same position to resign." Viewed in light of Couto's threat to "make[] it miserable enough for [an employee] to quit," however, these incidents could have greater significance. A reasonable jury might find that a reasonable person in the plaintiff's position would conclude that Couto was trying to drive her out, and that the relatively short period of mistreatment was only the beginning of a campaign of abuse that would continue until she quit. A jury could further find that a reasonable person would resign at that point rather than endure the continued mistreatment.

The trial court also appears to have based its ruling upon Spaulding's response to the plaintiff's complaint, stating:

> [Spaulding] took [the plaintiff's] claims seriously when she contacted human resources immediately after her negative performance review. Notwithstanding [Spaulding's] receptiveness to her claim, the plaintiff resigned eight business days later. At the time, [the plaintiff] had reported that the more abusive behaviors had stopped and that Ms. Couto was now ignoring her completely.

In addition, the court noted the plaintiff was informed, prior to her resignation, that Couto "had been counseled regarding the allegations," without the disclosure of the plaintiff's name.

However, a reasonable jury could conclude from the evidence that Couto's behavior did not change appreciably. Contrary to the trial court's characterization that "[f]ollowing the intervention of [Spaulding's] administration, Ms. Couto was no longer hostile toward [the plaintiff]," the plaintiff's dayminder continued to note, in the days following her complaint to Pestana, "still harsh remarks," "[c]old shoulder and sharp tongue all day," "[b]ad day, negative attitude, and I did nothing right in [Couto's] eyes."

■ We conclude that in apparently failing to consider Couto's prior behavior, particularly her alleged comment about forcing employees to quit by making things miserable for them, the trial court failed to "consider the evidence in the light most favorable to the party opposing the motion [for summary judgment], giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Iannelli v. Burger King Corp.*, 145 N.H. 190, 193 (2000) (quotation omitted). Because we cannot say as a matter of law that no reasonable person in the plaintiff's position would feel compelled to resign from Spaulding, we reverse the grant of summary judgment on the claim of wrongful discharge.

The plaintiff next argues that the trial court erred in ruling that her negligent supervision claim was barred by the exclusive remedy provision of the workers' compensation statute, RSA 281-A:8. Specifically, she argues that the claim was permitted under paragraph III of that section.

"In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used." *Portsmouth Country Club v.*

*Town of Greenland,* 152 N.H. 617, 620 (2005) (quotation omitted). RSA 281-A:8 provides, in pertinent part, as follows:

> I. An employee of an employer subject to this chapter shall be conclusively presumed to have accepted the provisions of this chapter and, on behalf of the employee or the employee's personal or legal representatives, to have waived all rights of action whether at common law or by statute or provided under the laws of any other state or otherwise:
> (a) Against the employer ...
> . . . .
> III. Nothing in this chapter shall derogate from any rights a former employee may have under common law or other statute to recover damages for wrongful termination of, or constructive discharge from, employment. However, if a former employee makes a claim under this chapter for compensation for injuries allegedly caused by such wrongful termination or constructive discharge, the employee shall be deemed to have elected the remedies of this chapter, and to have waived rights to recover damages for such wrongful termination or constructive discharge under common law or other statute. Similarly, if a former employee brings an action under common law or other statute to recover damages for such wrongful termination or constructive discharge, the employee shall be deemed to have waived claims under this chapter for compensation allegedly caused by such termination or discharge.

The trial court held that the claim for negligent supervision was not a wrongful termination claim and therefore was barred under RSA 281-A:8. We agree.

■ The plain language of RSA 281-A:8, III removes the workers' compensation bar from an action to "recover damages for wrongful termination of, or constructive discharge from, employment," should the former employee elect to pursue such a claim instead of a workers' compensation claim. Thus, the plaintiff's claim for wrongful discharge is not barred. The plaintiff's separate claim for negligent supervision, however, is not a claim for constructive discharge. Thus, it is barred by RSA 281-A:8, I(a).

> *Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.